BARNHART, COMMISSIONER OF SOCIAL SECURITY
*v.* PEABODY COAL CO. ET AL.

No. 01–705.   Argued October 8, 2002—Decided January 15, 2003*

---

*Together with *Barnhart, Commissioner of Social Security* v. *Bellaire Corp. et al.* (see this Court's Rule 12.4), and No. 01–715, *Holland et al.* v. *Bellaire Corp. et al.*, also on certiorari to the same court.

150

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR and THOMAS, JJ., joined, *post*, p. 172. THOMAS, J., filed a dissenting opinion, *post*, p. 184.

*Barbara B. McDowell* argued the cause for petitioner in No. 01–705. On the briefs were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Kneedler, Paul R. Q. Wolfson, William Kanter,* and *Jeffrey Clair.*

*Peter Buscemi* argued the cause for petitioners in No. 01–715. With him on the briefs were *John R. Mooney* and *David W. Allen.*

*John G. Roberts, Jr.,* argued the cause for Peabody Coal Co. et al., respondents in No. 01–705. With him on the brief were *Lorane F. Hebert* and *W. Gregory Mott. Jeffrey S. Sutton* argued the cause for Bellaire Corp. et al., respondents in both cases. With him on the brief were *Brian G. Selden, Louis A. Chaiten,* and *Thomas A. Smock.*†

JUSTICE SOUTER delivered the opinion of the Court.

The Coal Industry Retiree Health Benefit Act of 1992 (Coal Act or Act) includes the present 26 U. S. C. § 9706(a), providing generally that the Commissioner of Social Security "shall, before October 1, 1993," assign each coal industry retiree eligible for benefits to an extant operating company or a "related" entity, which shall then be responsible for funding the assigned beneficiary's benefits. The question is whether an initial assignment made after that date is valid despite its untimeliness. We hold that it is.

---

†*Mary Lou Smith* filed a brief for Elgin National Industries, Inc., as *amicus curiae* urging affirmance.

## I

We have spoken about portions of the Coal Act in two recent cases, *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438 (2002), and *Eastern Enterprises* v. *Apfel*, 524 U. S. 498 (1998), the first of which sketches the Act's history, 534 U. S., at 442–447. Here, it is enough to recall that in its current form the Act requires the Commissioner to assign, where possible, every coal industry retiree to a "signatory operator," defined as a signatory of a coal wage agreement specified in § 9701(b)(1). §§ 9701(c)(1), 9706(a). An assignment should turn on a retiree's employment history with a particular operator, § 9706(a), unless an appropriate signatory is no longer in business, in which case the proper assignee is a "related person" of that operator, defined in terms of corporate associations and relationships not in issue here, § 9701(c)(2).[1] The Act recognizes that some retirees will be "unassigned." § 9704(d).

Assignment to a signatory operator binds the operator to pay an annual premium to the United Mine Workers of America Combined Benefit Fund, established under the Act to administer benefits. § 9702. The premium has up to three components, starting with a "health benefit premium," computed by multiplying the number of assigned retirees by the year's "per beneficiary" premium, set by the Commissioner and based on the Combined Fund's health benefit expenses for the prior year, adjusted for changes in the Consumer Price Index. § 9704(b). The second element is a "death benefit premium" for projected benefits to the retirees' survivors, the premium being the operator's share of "the amount, actuarially determined, which the Combined Fund will be required to pay during the plan year for death benefits coverage." § 9704(c).

---

[1] The Coal Act's definition of "related persons" was the subject of our opinion last Term in *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438 (2002). For simplicity, we will not refer to related persons separately in the balance of this opinion.

A possible third constituent of the premium is for retirees who are not assigned to a particular operator, whose health and death benefits are nonetheless paid from the Combined Fund as if they were assigned beneficiaries. Before passage of the Coal Act, many operators withdrew from coal wage agreements, shifting the costs of paying for their retirees' benefits to the remaining signatories, *Sigmon Coal Co., supra,* at 444, and an important object of the Coal Act was providing stable funding for the health benefits of these "orphan retirees," House Committee on Ways and Means, Development and Implementation of the Coal Industry Retiree Health Benefit Act of 1992, 104th Cong., 1st Sess., 1 (Comm. Print 1995) (hereinafter Coal Act Implementation). See Energy Policy Act of 1992, Pub. L. 102–486, § 19142, 106 Stat. 3037 (intent to "stabilize plan funding" and "provide for the continuation of a privately financed self-sufficient program").

Before signatory operators may be compelled to contribute for the benefit of unassigned beneficiaries, however, funding from two other sources must run out. The United Mine Workers of America 1950 Pension Plan (UMWA Pension Plan) was required to make three substantial payments to the Combined Fund for this purpose on February 1, 1993, October 1, 1993, and October 1, 1994. § 9705(a)(1). The Act also calls for yearly payments to the Combined Fund from the Abandoned Mine Land Reclamation Fund (AML Fund), established for reclamation and restoration of land and water resources degraded by coal mining. 30 U. S. C. § 1231(c). Annual transfers from this AML Fund are limited to the greater of $70 million and the annual interest earned by the fund, and are subject to an aggregate limit equal to the amount of interest earned on the AML Fund between September 30, 1992, and October 1, 1995. §§ 1232(h)(2), (3)(B).

So far, these transfers from the UMWA Pension Plan and the AML Fund have covered the benefits of all unassigned beneficiaries. If they fall short, however, the third source comes into play (and the third element of an operator's Com-

bined Fund premium becomes actual): all assignee operators (that is, operators with assigned retirees) will have to pay an "unassigned beneficiaries premium," being their applicable percentage portion of the amount needed to pay annual benefits for the unassigned. An operator's "applicable percentage" is defined as "the percentage determined by dividing the number of eligible beneficiaries assigned under section 9706 to such operator by the total number of eligible beneficiaries assigned under section 9706 to all such operators (determined on the basis of assignments as of October 1, 1993)." 26 U. S. C. § 9704(f)(1). The signatory with the most assigned retirees thus would cover the greatest share of the benefits payable to the unassigned (as well as their spouses and certain dependants).[2]

## II

Although § 9706 provides that the Commissioner "shall" complete all assignments before October 1, 1993, the Commissioner did not, and she now estimates that some 10,000 beneficiaries were first assigned to signatory operators after the statutory date. The parties disagree on the reason the Commissioner failed to meet the deadline, but that dispute need not be resolved here.[3]

---

[2] According to a 1995 congressional Report, the total premium for a single beneficiary was $2,349.38 for the 1995 fiscal year. This figure includes only the health and death benefit premiums, since no unassigned beneficiaries premium has yet been charged. Coal Act Implementation 32–33. The 2002 per-beneficiary premium was approximately $2,725. General Accounting Office Report No. 02–243, Retired Coal Miners' Health Benefit Funds: Financial Challenges Continue 8 (Apr. 2002).

[3] The Commissioner's proffered reason for the delay is that the Social Security Administration (SSA) was not permitted to expend appropriated funds to commence work on assignments until July 13, 1993, when Congress enacted the Supplemental Appropriations Act of 1993, Pub. L. 103–50, 107 Stat. 254. The Commissioner also states that the task of researching employment records for approximately 80,000 coal industry workers in order to determine the appropriate signatory operators was monumental and could not have been completed by October 1, 1993, without additional resources. The respondent companies counter that the Acting

After October 1, 1993, the Commissioner assigned 330 beneficiaries to respondents Peabody Coal Company and Eastern Associated Coal Corp., and a total of 270 beneficiaries to respondents Bellaire Corporation, NACCO Industries, Inc., and The North American Coal Corporation. These companies challenged the assignments in two separate actions before different District Courts, claiming that the statutory date sets a time limit on the Commissioner's power to assign, so that a beneficiary not assigned on October 1, 1993 (and the beneficiary's eligible dependants) must be left unassigned for life. If the respondent companies are right, the challenged assignments are void and the corresponding benefits must be financed not by them, but by the transfers from the UMWA Pension Plan and the AML Fund and, if necessary, by unassigned beneficiary premiums paid by other signatory operators to whom timely assignments were made.

The Commissioner denied that Congress intended the Commissioner's tardiness in assignments to impose a permanent charge on the public AML Fund, otherwise earmarked for reclamation, or to raise the threat of permanently heavier financial burdens on companies that happened to get assignments before October 1, 1993. The Commissioner argued that Congress primarily intended coal operators to pay for their own retirees. The trustees of the Combined Fund in-

---

Commissioner assured Congress less than a month before the statutory date that SSA would meet its "statutory responsibility" to complete the assignments on time. Hearing on Provisions Relating to the Health Benefits of Retired Coal Miners before the House Ways and Means Committee, 103d Cong., 1st Sess., 26 (1993) (hereinafter 1993 Coal Act Hearing), Ser. No. 103–59, p. 26 (Comm. Print 1994) (statement of Acting Commissioner Thompson). The same representative informed Congress in 1995 that SSA had "completed the process of making the initial assignment decisions by October 1, 1993, as required by law." Hearing on the Coal Industry Retiree Health Benefit Act of 1992 before the Subcommittee on Oversight of the House Committee on Ways and Means, 104th Cong., 1st Sess., 23 (1995), Ser. No. 104–67, p. 23 (1997) (statement of Principal Deputy Commissioner Thompson).

tervened in one of the cases and took the Commissioner's view that initial assignments made after September 30, 1993, are valid.[4]

The companies obtained summary judgments in each case, on the authority of *Dixie Fuel Co.* v. *Commissioner of Social Security,* 171 F. 3d 1052 (CA6 1999), which went against the Commissioner on the issue here. The United States Court of Appeals for the Sixth Circuit affirmed in two opinions likewise following *Dixie Fuel—Peabody Coal Co.* v. *Massanari,* 14 Fed. Appx. 393 (2001), and *Bellaire Corp.* v. *Massanari,* 14 Fed. Appx. 424 (2001)—but conflicting with the Fourth Circuit's holding in *Holland* v. *Pardee Coal Co.,* 269 F. 3d 424 (2001). We granted certiorari to resolve the conflict,[5] 534 U. S. 1112 (2002), and now reverse.

### III

It misses the point simply to argue that the October 1, 1993, date was "mandatory," "imperative," or a "deadline," as of course it was, however unrealistic the mandate may have been. The Commissioner had no discretion to choose to leave assignments until after the prescribed date, and the assignments in issue here represent a default on a statutory duty, though it may well be a wholly blameless one. But the failure to act on schedule merely raises the real question, which is what the consequence of tardiness should be. The respondent companies call the failure "jurisdictional," such that the affected beneficiaries (like truly orphan beneficiaries) may never be assigned, but instead must be permanent

---

[4] The General Accounting Office estimated in 2000 that invalidation of assignments made after September 30, 1993, could require the Combined Fund to refund $57 million in premium payments. Letter of Gloria L. Jarmon to Hon. William V. Roth, Jr., Senate Committee on Finance 2 (Aug. 15, 2000), http://www.gao.gov/new.items/ai00267r.pdf (as visited Jan. 9, 2003) (available in Clerk of Court's case file).

[5] After the grant of certiorari, the United States Court of Appeals for the Third Circuit came down on the side of the Fourth Circuit. See *Shenango Inc.* v. *Apfel,* 307 F. 3d 174 (2002).

wards of the UMWA Pension Plan, the AML Fund, and, potentially, of coal operators without prior relationship to these beneficiaries. The companies, in other words, say that as to tardily assigned beneficiaries who were, perhaps, formerly their own employees, they go scot free. We think the claim is as unsupportable as it is counterintuitive.

## A

First there is the companies' position that couching the duty in terms of the mandatory "shall" together with a specific deadline leaves the Commissioner with no authority to make an initial assignment on or after October 1, 1993. We rejected a comparable argument in *Brock* v. *Pierce County*, 476 U. S. 253 (1986), dealing with the power of the Secretary of Labor to audit a grant recipient under a provision that he "'shall' issue a final determination . . . within 120 days" of receiving a complaint alleging misuse of federal grant funds. *Id.*, at 255. Like the Court of Appeals here, the Ninth Circuit in *Brock* thought the mandate and deadline together implied that Congress "had intended to prevent the Secretary from acting" after the statutory period, *id.*, at 257. We, on the contrary, expressed reluctance "to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake," *id.*, at 260, and reversed. As in this litigation, the Secretary's responsibility in *Brock* was "substantial," the "ability to complete it within 120 days [was] subject to factors beyond [the Secretary's] control," and "the Secretary's delay, under respondent's theory, would prejudice the rights of the taxpaying public." *Id.*, at 261. We accordingly read the 120-day provision as meant "to spur the Secretary to action, not to limit the scope of his authority," so that untimely action was still valid. *Id.*, at 265.

Nor, since *Brock*, have we ever construed a provision that the Government "shall" act within a specified time, without more, as a jurisdictional limit precluding action later. Thus,

a provision that a detention hearing "'shall be held immediately upon the [detainee's] first appearance before the judicial officer'" did not bar detention after a tardy hearing, *United States* v. *Montalvo-Murillo*, 495 U. S. 711, 714 (1990) (quoting 18 U. S. C. § 3142(f)), and a mandate that the Secretary of Health and Human Services "'shall report'" within a certain time did "not mean that [the] official lacked power to act beyond it," *Regions Hospital* v. *Shalala*, 522 U. S. 448, 459, n. 3 (1998).

We have summed up this way: "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States* v. *James Daniel Good Real Property*, 510 U. S. 43, 63 (1993).[6]

---

[6] No one could disagree with JUSTICE SCALIA that "[w]hen a power is conferred for a limited time, the *automatic* consequence of the expiration of that time is the expiration of the power," *post*, at 174–175 (dissenting opinion), but his assumption that the Commissioner's power to assign retirees was "conferred for a limited time" assumes away the very question to be decided. JUSTICE SCALIA's dissent is an elaboration on this circularity, forever returning as it must to his postulate that § 9706(a) constitutes a "time-limited mandate" that "expired" on the statutory date. *Post*, at 177, 178.

JUSTICE SCALIA's closest approach to a nonconclusory justification for his position is the assertion of an entirely formal interpretive rule that a date figuring in the same statutory subsection as the creation of a mandatory obligation *ipso facto* negates any power of tardy performance. *Post*, at 176–177. JUSTICE SCALIA cites no authority for his formalism, which is contradicted by *United States* v. *Montalvo-Murillo*, 495 U. S. 711 (1990), where a single statutory subsection provided that a judicial officer "shall hold a hearing" and that "[t]he hearing shall be held immediately upon the person's first appearance before the judicial officer." *Id.*, at 714 (quoting 18 U. S. C. § 3142(f)). Conversely, *Brock* v. *Pierce County*, 476 U. S. 253 (1986), *United States* v. *James Daniel Good Real Property*, 510 U. S. 43 (1993), and *Regions Hospital* v. *Shalala*, 522 U. S. 448 (1998), ascribed no significance to the formal placement of the time limitation. One can only ask why a statute providing that "The obligor shall perform its duty before October 1, 1993," should be thought to differ fundamentally from one providing that "(i) The obligor shall perform its duty. (ii) The obligor's

Hence the oddity at this date of a claim that late official action should shift financial burdens from otherwise responsible private purses to the public fisc, let alone siphon money from funds set aside expressly for a different public purpose, like the AML Fund for land reclamation. The point would be the same, however, even if *Brock* were the only case on the subject. The Coal Act was adopted six years after *Brock* came down, when Congress was presumably aware that we do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time. See *United States* v. *Wells*, 519 U. S. 482, 495 (1997).[7] The *Brock* example conse-

---

duty shall be performed before October 1, 1993." The accepted fact is that some time limits are jurisdictional even though expressed in a separate statutory section from jurisdictional grants, see, *e. g.*, 28 U. S. C. § 1291 (providing that the courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts of the United States"); § 2107 (providing that notice of appeal in civil cases must be filed "within thirty days after the entry of such judgment"); *Browder* v. *Director, Dept. of Corrections of Ill.*, 434 U. S. 257, 264 (1978) (stating that the limitation in § 2107 is " 'mandatory and jurisdictional' " (citation omitted)), while others are not, even when incorporated into the jurisdictional provision, see, *e. g.*, *Montalvo-Murillo, supra*. Formalistic rules do not account for the difference, which is explained by contextual and historical indications of what Congress meant to accomplish. Here that intent is revealed in several obvious ways: in rules that define an operator's liability in terms of employment history, see § 9706(a), in appellate rights to test the appropriateness of an initial assignment, see *infra*, at 167, and in the expressed understanding that the companies that got the benefit of a worker's labor should pay for the worker's benefits, see *infra*, at 164–166. What else, after all, would anyone naturally expect? As opposed to the sensible indications that the initial assignment deadline was not meant to be jurisdictional, JUSTICE SCALIA's new formal rule would thwart the statute's object and relieve the respondent companies of all responsibility, which other, less lucky operators might be required to shoulder. There undoubtedly was much political compromise in the development of the Coal Act, but politics does not justify turning the process of initial assignment into a game of chance.

[7] The respondent companies attempt to distinguish *Brock* because we noted in that case that an aggrieved party could sue under the Administrative Procedure Act to " 'compel agency action unlawfully withheld or un-

quently has to mean that a statute directing official action needs more than a mandatory "shall" before the grant of power can sensibly be read to expire when the job is supposed to be done. Nothing so limiting, however, is to be found in the Coal Act: no express language supports the companies, while structure, purpose, and legislative history go against them.

Structural clues support the Commissioner in the Coal Act's other instances of combining the word "shall" with a specific date that could not possibly be read to prohibit action outside the statutory period. Congress, for example, provided that the UMWA Pension Plan "shall transfer to the Combined Fund" installments of $70 million on February 1, 1993, on October 1, 1993, and on October 1, 1994. § 9705(a)(1). It could not be that a failure to make a transfer on one of those precise dates, for whatever reason, would have left the UMWA Pension Plan with no authority to make the payment; October 1, 1994, was not even a business day. Or consider the Act's mandatory provisions that the trustees of the Combined Fund "shall" be designated no later than 60 days from the enactment date, § 9702(a)(1), and that the designated trustees "shall, not later than 60 days after the enactment date," give the Commissioner certain information about benefits, § 9704(h). No one could seriously argue that the entire scheme would have been nullified if appointments had been left to the 61st day, or that trustees (whose appoint-

reasonably delayed,'" 476 U. S., at 260, n. 7 (quoting 5 U. S. C. § 706(1)). The companies assert that no such remedy would have applied to the Commissioner's duty under § 9706(a). Whether or not this is the case, the companies do not argue that they were aggrieved by the failure to assign retirees by the statutory date. On the contrary, they temporarily avoided payment of premium amounts for which they would indisputably have been liable had the assignments been timely made. It therefore does not appear that there was a need to provide operators "with any remedy at all—much less the drastic remedy respondent[s] see[k] in this case—for the [Commissioner's] failure to meet the [October 1, 1993] deadline." 476 U. S., at 260, n. 7.

ments could properly have been left to the 60th day) were powerless to divulge information to the SSA after the 60-day period had expired.[8]

---

[8]JUSTICE SCALIA concedes that his theory should not extend so far as to limit the UMWA Pension Plan's duty to transfer funds to the Combined Fund to the particular dates in § 9705(a)(1). JUSTICE SCALIA attempts to avoid such an outcome by assuming, without basis, that the "UMWA Pension Plan has the power to transfer funds" to the Combined Fund in the absence of the authorization in § 9705(a)(1). *Post*, at 176 (dissenting opinion). JUSTICE SCALIA's confidence is misplaced. Prior to the Coal Act's enactment, the Vice Chairman of the Secretary of Labor's Coal Commission testified before Congress that legislative authorization was needed for such a transfer to occur: "One of the things that concerned the Commission was, first of all, our understanding of the present state of law under the Employee Retirement Income Security Act. Under that Act it is not within the power of any of the participants or signatories to transfer a pension surplus to a benefit fund. That is one of the reasons for the recommendation that a transfer be authorized." Hearing before the Subcommittee on Medicare and Long-Term Care of the Senate Committee on Finance, 102d Cong., 1st Sess., 13 (1991) (statement of Coal Commission Vice Chairman Perritt). It appears, then, that § 9705(a)(1) provides both the UMWA Pension Plan's power to act and a time limit, which according to JUSTICE SCALIA would render action on any other date ultra vires, a result that even the dissent does not embrace.

JUSTICE SCALIA thinks it "debatable" that the power to appoint initial trustees survives the deadline in § 9702(a)(1). *Post*, at 177. In order to avoid the embarrassment of concluding that tardiness would remove all authority to appoint the initial trustees, which would render the Act a dead letter, he suggests that an initial trustee could be appointed under § 9702(b)(2), even though that provision applies only to appointment of a "successor trustee" to be made "in the same manner as the trustee being succeeded," whereas an initial trustee does not "succeed" anyone. The extreme implausibility of JUSTICE SCALIA's suggested reading of § 9702(b)(2) points up the unreasonableness of placing a jurisdictional gloss on the § 9706(a) time limitation. It is impossible to believe that Congress meant its Herculean effort to resolve the coal industry benefit crisis to come to absolutely nothing if trustees were designated late.

There is a basic lesson to be learned from JUSTICE SCALIA's contortions to avoid the untoward results flowing from his formalistic theory that time limits on mandatory official action are always jurisdictional when they

In each of these instances, we draw a conclusion on grounds of plausibility: if Congress had meant to set a counterintuitive limit on authority to act, it would have said more than it did, and would surely not have couched its intent in language *Brock* had already held to lack any clear jurisdictional significance. The same may be said here.

## B

Nor do we think the result of appealing to plausibility is affected by either of two other textual features that the companies take as indicating inability to assign beneficiaries after the statutory date: the provision for unassigned beneficiary status itself, and the provision that an operator's contribution for the benefit of the unassigned shall be calculated "on the basis of assignments as of October 1, 1993." §§ 9704(f)(1), (2).

### 1

The companies characterize the provision for unassigned beneficiaries as the specification of a "consequence" for failure to assign a beneficiary to an operator or related person. Cf. *Brock*, 476 U. S., at 259. Specifying this consequence of failure, they say, shows that the failure must be governed by the consequence provided, not corrected by a tardy assignment corresponding to one that should have been made earlier. The specified consequence, in other words, reflects a legislative preference for finality over accurate initial assignments and creates a right on the part of the companies to rely permanently on the state of affairs as they were on October 1, 1993. We think this line of reasoning is unsound at every step.

To begin with, whatever might be inferable from the fact that a specific provision addressed the failure to make a

---

occur in an authorizing provision. The lesson is that something is very wrong with the theory.

timely assignment, the part of the Act referring to "unassigned" beneficiaries is not any such provision. The Act speaks of the beneficiaries not in terms of the Commissioner's failure to assign them in time, but simply as "beneficiaries who are not assigned." § 9704(d). The most obvious reason for beneficiaries' being unassigned, in fact, is the disappearance of a beneficiary's former employer, leaving no signatory operator for assignment under § 9706(a). This is not to say that failure of timely assignment does not also leave a beneficiary "unassigned" under the Act. It simply means that unassigned status has no significance peculiar to failure of timely assignment.

Second, to the extent that "unassigned" status is a consequence of mere untimeliness, there would be a far more obvious reason for specifying that consequence than a supposed desire for finality.[9] On its face, the provision for a beneficiary left out through tardiness functions simply as a default rule to provide coverage under the new regime required to be in place by October 1, 1993; there had to be some source of funding for every beneficiary by then, and provisions for the "unassigned" employees tell the SSA what the source will be in the absence of any other. But we do not read a provision apparently made for want of something better as an absolute command to forgo something better for all time.

In fact, it is unrealistic to think that Congress understood unassigned status as an enduring "consequence" of uncompleted work, for nothing indicates that Congress even foresaw that some beneficiaries matchable with operators still in

---

[9] Many "consequences," of course, are intended to induce an obligated person to take untimely action rather than bar that action altogether. Section 9704(i)(1)(C), for example, denies certain tax deductions to operators who fail to make contributions during specified periods, and § 9707(a) provides a penalty for operators who fail to pay premiums on time. The first consequence is eliminated when the operator takes action that is necessarily untimely, and the second penalty ceases to run when the premiums are paid, albeit out of time.

business might not be assigned before October 1, 1993. As the companies themselves point out, the Commissioner led Congress to believe as late as 1995 that all possible assignments had been made on time, see n. 3, *supra*, and such little legislative history as there is on the point tends to show that Congress assumed that any assignments that could be made at all (say, to an operator still in business) would be made on time. On October 8, 1992, on the heels of the Conference Committee Report on the Act and just before the vote in the Senate adopting the Act, Senator Wallop gave a detailed explanation of the Coal Act's provisions for unassigned beneficiaries, which assumed that the "unassigned" would be true orphans:

> "As a practical matter, not all beneficiaries can be assigned to a specific last signatory operator, related person or assigned operator for payment purposes. This is because in some instances, none of those persons remain in business, even as defined to include non-mining related businesses. Thus, provisions are made for unassigned beneficiary premiums." 138 Cong. Rec. 34003 (1992).

The Senator's report says that the transfer to the Combined Fund from the UMWA Pension Plan and AML Fund would be made because "unassigned beneficiaries were not employed by the assigned operators at the time of their retirement . . . . [I]f no operator remains in business under the formulations described above, that retiree becomes an unassigned beneficiary. . . . [The Coal Act's] purpose is to assure that any beneficiary, once assigned, remains the responsibility of a particular operator, and that the number of unassigned beneficiaries is kept to an absolute minimum." *Ibid.*[10] It seems not to have crossed Congress's mind that

---

[10] Postenactment statements, though entitled to less weight, are to the same effect. At a hearing before the House Committee of Ways and Means on September 9, 1993, one member asked whether SSA had estab-

the category of the "unassigned" would include beneficiaries, let alone a lot of beneficiaries, who could be connected with an operator, albeit late. Providing a consequence of default was apparently just happenstance.[11]

Congress plainly did, however, weigh finality on October 1, 1993, against accuracy of initial assignments in one circumstance, and accuracy won. Section 9704(d) speaks of "beneficiaries who are not assigned . . . for [any] plan year," sug-

---

lished procedures "to assure that beneficiaries are not improperly designated as unassigned." The Acting Commissioner of Social Security responded that employee training "emphasized that the intent of the Coal Act was to assign miners to mine operators if at all possible." 1993 Coal Act Hearing 46 (statements of Rep. Johnson and Acting Commissioner Thompson). The record of the hearing also contains a statement by the committee chairman that the Act required operators to "pay for their own retirees, and to assume a proportionate share of the liability for true 'orphans'—retirees whose companies are no longer in existence and cannot pay for the benefits." Id., at 85. At no point did any witness suggest that the unassigned beneficiary system was intended for miners who could be assigned but were not assigned before October 1, 1993, or that such miners would remain unassigned in perpetuity in order to protect the status quo on that date.

[11] The respondent companies cite a postenactment statement by Representative Johnson that Congress had an obligation to "make sure that companies . . . have time to figure out their liability and prepare to deal with it." Id., at 42. The Representative's comment did not purport to interpret the Coal Act as adopted, however, but was made in discussing whether "there should be some resolution passed" to give coal operators more time to prepare for their Coal Act obligations. Ibid.

One statement in Senator Wallop's preenactment report, which the companies do not cite, indicates an understanding that assignments would be fixed after October 1, 1993. See 138 Cong. Rec. 34003 (1992) ("[T]he percentage of the unassigned beneficiary premiums allocable to each assigned operator on October 1, 1993 will remain fixed in future years"). As discussed, however, there is no indication that Congress foresaw that the Commissioner would be unable to complete assignments by the statutory date. A general statement made on the assumption that all assignments that could ever be made would be made before October 1, 1993, does not show a legislative preference for finality over accuracy now that that assumption has proven incorrect.

gesting that assignment status may change from year to year. One way it may change is by correcting an erroneous assignment. Under the Act, an operator getting notice of an assignment has 30 days to request information regarding the basis of the assignment and then 30 days from receipt of that information to ask for reconsideration. §§ 9706(f)(1)–(2). If the Commissioner finds error, the Combined Fund trustees will fix it by reducing premiums and refunding any overpayments. § 9706(f)(3)(A)(i); see also § 9706(f)(3)(A)(ii). Nothing is said about finality on October 1, 1993, and no time limit whatever is imposed on the Commissioner's authority to reassign. The companies concede, as they must, that the statute permits reassignment after October 1, 1993.

The companies do, however, try to limit the apparent preference for accuracy by arguing that one feature of this provision for reconsideration in § 9706(f) implicitly supports them; this specific and isolated exception to an otherwise unequivocal bar to assignments after the statutory date suggests, they say, that the bar is otherwise absolute. Again, we think no such conclusion follows.

First, the argument is circular; it assumes that the availability of the § 9706(f) reconsideration process with no time limit is an exception to a bar on all assignment activity imposed by the October 1, 1993, time limit of § 9706(a). But the question, after all, is whether the October 1, 1993, mandate is in fact a bar. Section 9706(f) does not say it is, and nothing in that provision suggests it was enacted as an exception to the October 1, 1993, date. It has no language about operating notwithstanding the date specified in § 9706(a); on the contrary, it states that reassignment will be made "under subsection (a)," § 9706(f)(3)(A)(ii). But if the authority to reassign is contained in § 9706(a), then § 9706(f) is reasonably read not as lifting a jurisdictional time bar but simply as specifying a procedure for an aggrieved operator to follow in requesting the Commissioner to exercise the assignment power contained in § 9706(a) all along. In the com-

bined operation of the two subsections, there is thus no implication that the Commissioner is powerless to make an initial assignment to an operator after the specified date; any suggestion goes the other way.

Second, there is no reason to read the provision in § 9706(f) for correction of erroneous assignments as implying that the Commissioner should not employ her § 9706(a) authority to make a tardy initial assignment in a situation like this. We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it. *United Dominion Industries, Inc.* v. *United States,* 532 U. S. 822, 836 (2001). As we have held repeatedly, the canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an "associated group or series," justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence. *United States* v. *Vonn,* 535 U. S. 55, 65 (2002). We explained this point as recently as last Term's unanimous opinion in *Chevron U. S. A. Inc.* v. *Echazabal,* 536 U. S. 73, 81 (2002):

> "Just as statutory language suggesting exclusiveness is missing, so is that essential extrastatutory ingredient of an expression-exclusion demonstration, the series of terms from which an omission bespeaks a negative implication. The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded. E. Crawford, Construction of Statutes 337 (1940) (*expressio unius* '"properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference"' (quoting *State ex rel. Curtis* v. *De Corps,*

134 Ohio St. 295, 299, 16 N. E. 2d 459, 462 (1938)));
*United States* v. *Vonn, supra.*"

As in *Echazabal,* respondents here fail to show any reason
that Congress would have considered reassignments after
appeal "to go hand in hand" with tardy initial assignments.
Since Congress apparently never thought that initial assign-
ments would be late, see *supra,* at 164–167, the better infer-
ence is that what we face here is nothing more than a case
unprovided for.[12]

_____

[12] There is, of course, no "'case unprovided for' exception" to the *ex-
pressio unius* canon, *post,* at 181 (SCALIA, J., dissenting). It is merely
that the canon does not tell us that a case was provided for by negative
implication unless an item unmentioned would normally be associated with
items listed.

The companies emphasize that § 9704(f)(2)(B) requires that beneficiaries
whose operator goes out of business must be treated as unassigned and
cannot be reassigned. Even assuming that a provision that goes to the
definition of "applicable percentage" and does not directly implicate as-
signments has the effect the companies suggest, the most that could be
said is that Congress wished to identify the first, most responsible opera-
tor for a given retiree, and not to follow that with a second assignment to
a less responsible operator if the initial assigned operator left the business.
This interest does not indicate an object of date-specific finality over accu-
racy in the first assignment; on the contrary, it opts for finality only once
an accurate initial assignment has been made. In the absence of a more
exact explanation for this arrangement, we suppose the explanation is
good political horse trading. But provisions that by their terms govern
after the initial assignment is made tell us nothing about the period in
which an initial assignment may be made. In fact, the permissibility
under § 9706(f) of postappeal reassignment after October 1, 1993, makes
plain that Congress was not "insisting upon as perfect a matchup as possi-
ble *up to October 1, 1993,* and then prohibiting future changes, both by way
of initial assignment or otherwise," *post,* at 183 (SCALIA, J., dissenting),
as JUSTICE SCALIA himself agrees. On the contrary, the reassignment
provision indicates that a system of accuracy "in *initial* assignments,
whether made *before* the deadline *or afterward,*" is precisely what the Act
envisions. *Ibid.* Here, as throughout this opinion, "accuracy" refers not
to an elusive system of "perfect fairness," *ibid.,* but to assignments by the
Commissioner following the scheme set out in §§ 9706(a)(1)–(3).

2

The remaining textual argument for the companies' side rests on the definition of an operator's "applicable percentage" of the overall obligation of all assignee operators (or related persons) to fund benefits for the unassigned. Under § 9704(f)(1), it is defined as the percentage of the operator's own assigned beneficiaries among all assigned beneficiaries "determined on the basis of assignments as of October 1, 1993" (parenthesis omitted). The companies argue that the specification "as of" October 1, 1993, means that an assigned operator's percentage of potential liability for the benefit of the unassigned is fixed according to the assignments made at that date, subject only to specific exceptions set out in § 9704(f)(2), requiring a change in the percentage when erroneously assigned retirees are reassigned or assignee operators go out of business. The companies contend that their position rests on plain meaning: "as of" the date means "as assignments actually stand" on the date. Yet the words "as of," as used in the statute, can be read another way: since Congress required that all possible assignments be complete on October 1, 1993, see § 9706(a), it is equally fair to read assignments "as of" that date to mean "assignments as they shall be on that date, assuming the Commissioner complies with our command." The companies' reading is hospitable to early finality of assignments, while the alternative favors completeness and accuracy before finality prevails.

Once it is seen that there is no "plain" reading, however, there is nothing left of the "as of" argument except its stress that the applicable percentage can be modified only in accordance with the two exceptions recognizing changes for initial error or the demise of an assignee operator. The answer to this point, of course, has already been given. The enunciation of two exceptions does not imply an exclusion of a third unless there is reason to think the third was at least considered, whereas there is good reason to conclude that when Congress adopted the language in question it did not

foresee a failure to make timely assignments. See *supra*, at 168–169. The phrase "as of" cannot be read to govern a situation that Congress clearly did not contemplate,[13] nor does it require the absolute finality of assignments urged by the companies.

## IV

This much is certain: the Coal Act rests on Congress's stated finding that it was necessary to "identify persons most responsible for plan liabilities," and on its express desire to "provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits," Energy Policy Act of 1992, Pub. L. 102–486, § 19142, 106 Stat. 3037.[14] In the words of Senator Wallop's report delivered shortly before enactment, the statute is "designed to allocate the greatest number of beneficiaries in the Plans to a prior

---

[13] The same may be said of the provision for an initial trustee to serve until November 1, 1993, § 9702(b)(3)(B), contrary to JUSTICE SCALIA's view. *Post*, at 182 (dissenting opinion).

[14] Under the respondent companies' view, if the transfers from the AML Fund prove insufficient to cover the benefits of all unassigned beneficiaries, an operator that received no assignments prior to October 1, 1993, would not have to contribute a penny to the unassigned beneficiary pool—solely due to the Commissioner's fortuitous failure to make all assignments by the statutory deadline. At the same time, operators that received full assignments prior to October 1, 1993, would be forced to cover more than their fair share of unassigned beneficiaries' premiums.

Although JUSTICE SCALIA sees the Act as rife with "seemingly unfair and inequitable provisions," *ibid.* (dissenting opinion), even his view is no reason to assume that Congress meant contested provisions to be construed in the most unfair and inequitable manner possible. In any event, JUSTICE SCALIA's citation of § 9704(f)(2)(B) does not help his position. It provides a clear statutory solution to a problem Congress anticipated: the end of an assigned operator's business. Had Congress propounded a response to the issue now before us as clear as § 9704(f)(2)(B), there would doubtless have been no split in the Courts of Appeals and no cases for us to review. Given the absence of an express provision, the statute's goals are best served by treating operators the way Congress intended them to be treated, that is, by allowing the Commissioner to identify the operators most responsible.

responsible operator. For this reason, definitions are intended by the drafters to be given broad interpretation to accomplish this goal." 138 Cong. Rec. 34001 (1992).[15] To accept the companies' argument that the specified date for action is jurisdictional would be to read the Act so as to allocate not the greatest, but the least, number of beneficiaries to a responsible operator. The way to reach the congressional objective, however, is to read the statutory date as a spur to prompt action, not as a bar to tardy completion of the business of ensuring that benefits are funded, as much as possible, by those identified by Congress as principally responsible.

The judgments of the Court of Appeals in both cases are accordingly

*Reversed.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

The Court's holding today confers upon the Commissioner of Social Security an unexpiring power to assign retired coal miners to signatory operators under 26 U. S. C. § 9706(a). In my view, this disposition is irreconcilable with the text and structure of the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act or Act), and finds no support in our precedents. I respectfully dissent.

## I

The respondents contend that the Commissioner improperly assigned them responsibility for 600 coal miners under § 9706(a). Section 9706(a) provides, in pertinent part:

---

[15] A Congressional Research Service report dated shortly before the enactment likewise states that the Act envisioned that "[w]herever possible, responsibility for individual beneficiaries would be assigned . . . to a previous employer still in business." Coal Industry: Use of Abandoned Mine Reclamation Fund Monies for UMWA "Orphan Retiree" Health Benefits (Sept. 10, 1992), reprinted in 138 Cong. Rec., at 34005.

"[T]he Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:

"(1) First, to the signatory operator which—

"(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

"(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

"(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—

"(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

"(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

"(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement."

The Commissioner failed to complete the task of assigning each eligible beneficiary to a signatory operator before October 1, 1993. As a result, many eligible beneficiaries were "unassigned," and their benefits were financed, for a time, by the United Mine Workers of America 1950 Pension Plan (UMWA Pension Plan) and the Abandoned Mine Land Reclamation Fund. See §§ 9705(a)(3)(B), 9705(b)(2).

The Commissioner blames her failure to meet the statutory deadline on the "magnitude of the task" and the lack of appropriated funds. Brief for Petitioners Trustees of the UMWA Combined Benefit Fund 15. It should not be thought, however, that these cases are about letting the

Commissioner complete a little unfinished business that barely missed the deadline. They concern some 600 post-October 1, 1993, assignments to these respondents, the vast majority of which were made between 1995 and 1997, *years after the statutory deadline had passed*. App. 98–121. Respondents contend that these assignments are unlawful, and unless Congress has conferred upon the Commissioner the power that she claims—an *unexpiring* authority to assign eligible beneficiaries to signatory operators—the respondents must prevail. Section 9706(a) does not provide such an expansive power, and the other provisions of the Act confirm this.

## II

It is well established that an agency's power to regulate private entities must be grounded in a statutory grant of authority from Congress. See *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 161 (2000); *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208 (1988); *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U. S. 355, 374 (1986). This principle has special importance with respect to the extraordinary power the Commissioner asserts here: to compel coal companies to pay miners (and their families) health benefits that they never contracted to pay. We have held that the Commissioner's use of this power under § 9706(a), even when exercised before October 1, 1993, violates the Constitution to the extent it imposes severe retroactive liability on certain coal companies. See *Eastern Enterprises* v. *Apfel*, 524 U. S. 498 (1998). When an agency exercises a power that so tests constitutional limits, we have all the more obligation to assure that it is rooted in the text of a statute.

The Court holds that the Commissioner retains the power to act after October 1, 1993, because Congress did not " 'specify a consequence for noncompliance' " with the statutory deadline. *Ante*, at 159. This makes no sense. When a power is conferred for a limited time, the *automatic* consequence of the expiration of that time is the expiration of the

power. If a landowner authorizes someone to cut Christmas trees "before December 15," there is no doubt what happens when December 15 passes: The authority to cut terminates. And the situation is not changed when the authorization is combined with a mandate—as when the landowner enters a contract which says that the other party "shall cut all Christmas trees on the property before December 15." Even if time were not of the essence of that contract (as it *is* of the essence of § 9706(a), for reasons I shall discuss in Part III, *infra*) no one would think that the contractor had continuing authority—not just for a few more days or weeks—but perpetually, to harvest trees.[1]

The Court points out, *ante*, at 161–162, that three other provisions of the Coal Act combine the word "shall" with a statutory deadline that in its view *is* extendible:

(1) Section 9705(a)(1)(A) states that the UMWA Pension Plan "shall transfer to the Combined Fund . . . $70,000,000 on February 1, 1993";

(2) § 9704(h) says the trustees for the Combined Fund "shall, not later than 60 days" after the enactment date,

---

[1] This interpretation of § 9706(a) does not "assum[e] away the very question to be decided," as the Court accuses, *ante*, at 159, n. 6. It is no assumption at all, but rather the consequence of the proposition that the scope of an agency's power is determined by the text of the statutory grant of authority. Because § 9706(a)'s power to "assign . . . eligible beneficiar[ies]" is *prefaced by* the phrase "before October 1, 1993," the statutory date is intertwined with the grant of authority; it is part of the very definition of the Commissioner's power. If the statute provided that the Commissioner "shall, on or after October 1, 1993," assign each eligible beneficiary to a signatory operator, it would surely be beyond dispute that pre-October 1, 1993, assignments were ineffective. No different conclusion should obtain here, where the temporal scope of the Commissioner's authority is likewise defined according to a clear and unambiguous date. If this is (as the Court charges) "formalism," *ibid.*, it is only because language *is* a matter of form. Here the form that Congress chose presumptively represents the political compromise that Congress arrived at.

furnish certain information regarding benefits to the Commissioner; and

(3) § 9702(a)(1) provides that certain individuals de-scribed in § 9702(b)(1) "shall designate" the trustees for the Combined Fund "not later than 60 days . . . after the enactment date."

I agree that the actions mandated by the first two of these deadlines can be taken after the deadlines have expired (though perhaps not *forever* after, which is what the Court claims for the deadline of § 9706(a)). The reason that is so, however, does not at all apply to § 9706(a). In those provi-sions, *the power to do what is mandated does not stem from the mere implication of the mandate itself.* The private entities involved have the power to do what is prescribed, quite apart from the statutory command that they do it by a certain date: The UMWA Pension Plan has the power to transfer funds,[2] and the trustees of the Combined Fund have the power to provide the specified information, whether the statute commands that they do so or not. The only question

---

[2] Private entities, unlike administrative agencies, do not need authoriza-tion from Congress in order to act—they have the power to take all action within the scope of their charter, unless and until the law forbids it. The Court suggests that the Employee Retirement Income Security Act of 1974 (ERISA) may actually forbid the UMWA Pension Plan from transfer-ring its pension surplus to the benefit fund. *Ante,* at 162–163, n. 8. But if this is true, that does not convert § 9705(a)(1) into a power-conferring statutory provision in the mold of § 9706(a). It instead means that the UMWA Pension Plan is subject to contradictory statutory mandates, and the relevant question becomes whether, and to what extent, § 9705(a)(1) implicitly repealed the provisions of ERISA as applied to the UMWA Pen-sion Plan. Resolving that question would be no small task, given our disinclination to find implied repeals, see *Morton* v. *Mancari,* 417 U. S. 535, 551 (1974), and I will not speculate on it. Instead, I am content to go along with the Court's assumption that nothing in § 9705(a)(1), or in the rest of the Coal Act, prevents the UMWA Pension Plan from transferring money to the Combined Fund after the statutory deadline, and to empha-size that nothing in this concession lends support to the Court's interpre-tation of § 9706(a).

is whether the *late* exercise of an unquestionably authorized act will produce the consequences that the statute says will follow from a *timely* exercise of that act. It is as though, to pursue the tree-harvesting analogy, a contract provided that the *landowner* will harvest and deliver trees by December 15; even after December 15 passes, he can surely harvest and deliver trees, and the only issue is whether the December 15 date is so central to the contract that late delivery does not have the contractual consequence of requiring the other side's counterperformance. The Commissioner of Social Security, by contrast, being not a private entity but a creature of Congress, has *no authority* to assign beneficiaries to operators except insofar as such authority is implicit in the mandate; but the mandate (and hence the implicit authority) expired on October 1, 1993.

The last of these three provisions *does* confer a power that is not otherwise available to the private entities involved: the power to appoint initial trustees to the board of the Combined Fund. I do not, however, think it as clear as the Court does—indeed, I think it quite debatable—whether that power survives the deadline. If it be thought utterly essential that all the trustees be in place, it seems to me just as reasonable to interpret the provision for appointment of successor trustees (§ 9702(b)(2)) to include the power to fill vacancies arising from initial failure to appoint, as to interpret the initial appointment power to extend beyond its specified termination date. The provision surely does not establish the Court's proposition that time-limited mandates include continuing authority.

### III

None of the cases on which the Court relies is even remotely in point. In *Brock* v. *Pierce County,* 476 U. S. 253 (1986), the agency action in question was authorized by an explicit statutory grant of authority, separate and apart from the provision that contained the time-limited mandate.

Title 29 U. S. C. § 816(d)(1) (1976 ed., Supp. V) (now repealed) gave the Secretary of Labor "authority to . . . order such sanctions or corrective actions as are appropriate." *Another* provision of the statute, former § 816(b), required the Secretary, when investigating a complaint that a recipient is misusing funds, to "make the final determination . . . regarding the truth of the allegation . . . not later than 120 days after receiving the complaint." We held that the Secretary's failure to meet the 120-day deadline did not prevent him from ordering repayment of misspent funds. Respondent had not, we said, shown anything that caused the Secretary to "*lose* its power to act," 476 U. S., at 260 (emphasis added). Here, by contrast, the Commissioner *never had* power to act apart from the mandate, which expired after October 1, 1993.

In *United States* v. *James Daniel Good Real Property,* 510 U. S. 43 (1993), federal statutes authorized the Government to bring a forfeiture action within a 5-year limitation period. 21 U. S. C. § 881(a)(7); 19 U. S. C. § 1621. We held that that power was not revoked by the Government's failure to comply with some of the separate "internal timing requirements" set forth in §§ 1602–1604. Because those provisions failed to specify a consequence for noncompliance, we refused to "impose [our] own coercive sanction" of terminating the Government's authority to bring a forfeiture action. *James Daniel Good, supra,* at 63. The authorization *separate from the defaulted obligation* was not affected. There is no authorization separate from the defaulted obligation here.

In *United States* v. *Montalvo-Murillo,* 495 U. S. 711 (1990), the statute at issue, 18 U. S. C. § 3142(e), gave courts power to order pretrial detention "after a hearing pursuant to the provisions of subsection (f) of this section." One of those provisions was that the hearing "shall be held immediately upon the person's first appearance before the judicial officer . . . ." § 3142(f). The court had failed to hold a hearing immediately upon the respondent's first appearance, yet

we held that the authority to order pretrial detention was unaffected. As we explained: "It is conceivable that some combination of procedural irregularities *could* render a detention hearing so flawed that it would *not* constitute 'a hearing pursuant to the provisions of subsection (f)' for purposes of § 3142(e)," 495 U. S., at 717 (emphasis added), but the mere failure to comply with the first-appearance requirement did not alone have that effect. Once again, the case holds that an authorization *separate from the defaulted obligation* is not affected; and there is no authorization separate from the defaulted obligation here.

The contrast between these cases and the present ones demonstrates why the Court's extended discussion of whether Congress specified consequences for the Commissioner's failure to comply with the October 1 deadline, *ante,* at 163–164, is quite beside the point. A specification of termination of authority may be needed where there is a separate authorization to be canceled; it is utterly superfluous where the only authorization is contained in the time-limited mandate that has expired.

## IV

That the Commissioner lacks authority to assign eligible beneficiaries after the statutory deadline is confirmed by other provisions of the Coal Act that are otherwise rendered incoherent.

## A

The calculation of "death benefit premiums" and "unassigned beneficiaries premiums" owed by coal operators is based on an assigned operator's "applicable percentage," which is defined in § 9704(f) as "the percentage determined by dividing the number of eligible beneficiaries assigned under section 9706 to such operator by the total number of eligible beneficiaries assigned under section 9706 to all such operators *(determined on the basis of assignments as of October 1, 1993)."* (Emphasis added.) The statute specifies

only two circumstances in which adjustments may be made to an assigned operator's "applicable percentage": (1) when changes to the assignments "as of October 1, 1993," result from the appeals process set out in § 9706(f), see § 9704(f)(2)(A); and (2) when an assigned operator goes out of business, see § 9704(f)(2)(B). *No* provision allows adjustments to account for post-October 1, 1993, initial assignments. This is perfectly consistent with the view that the § 9706(a) power to assign does not extend beyond October 1, 1993; it is incompatible with the Court's holding to the contrary.

The Court's response to this structural dilemma is nothing short of astonishing. The Court concludes that the applicable percentage based on assignments as of October 1, 1993, *may* be adjusted to account for the subsequent initial assignments, notwithstanding the statutory *command* that the applicable percentage be determined "on the basis of assignments as of October 1, 1993," and notwithstanding the statute's provision of two, and only two, exceptions to this command that do not include post-October 1, 1993, initial assignments. "The enunciation of two exceptions," the Court says, "does not imply an exclusion of a third unless there is reason to think the third was at least considered." *Ante,* at 170. Here, "[s]ince Congress apparently never thought that initial assignments would be late, . . . the better inference is that what we face . . . is nothing more than a case unprovided for." *Ante,* at 169 (referred to *ante,* at 170–171). This is an unheard-of limitation upon the accepted principle of construction *inclusio unius, exclusio alterius.* See, *e. g., O'Melveny & Myers* v. *FDIC,* 512 U. S. 79, 86 (1994); *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U. S. 163, 168 (1993). It is also an absurd limitation, since it means that the more *unimaginable* an unlisted item is, the more *likely* it is *not* to be excluded. Does this new maxim mean, for example, that exceptions to the hearsay rule beyond those set forth in the Federal Rules

of Evidence must be recognized if it is unlikely that Congress (or perhaps the Rules committee) "considered" those unnamed exceptions? Our cases do not support such a proposition. See, *e. g., Williamson* v. *United States,* 512 U. S. 594 (1994); *United States* v. *Salerno,* 505 U. S. 317 (1992).[3] There is no more reason to make a "case unprovided for" exception to the clear import of an exclusive listing than there is to make such an exception to any other clear textual disposition. In a way, therefore, the Court's treatment of this issue has *ample* precedent—in those many wrongly decided cases that replace what the legislature said with what courts think the legislature *would have said (i. e.,* in the judges' estimation *should have said)* if it had only "considered" unanticipated consequences of what it *did* say (of which the courts disapprove). In any event, the relevant question here is not whether § 9704(f)(2) *excludes* other grounds for adjustments to the applicable percentage, but rather whether anything in the statute affirmatively *authorizes* them. The answer to that question is no—an answer that should not surprise the Court, given its acknowledgment that Congress "did not foresee a failure to make timely assignments." *Ante,* at 170–171.

---

[3] The most enduring consequence of today's opinion may well be its gutting of the ancient canon of construction. It speaks volumes about the dearth of precedent for the Court's position that the principal case it relies upon, *ante,* at 168–169, is *Chevron U. S. A. Inc.* v. *Echazabal,* 536 U. S. 73 (2002). The express language of the statute interpreted in that case demonstrated that the single enumerated example of a "qualification standard" was illustrative rather than exhaustive: "The term 'qualification standards' *may include* a requirement that an individual shall not pose any direct threat to the health or safety of other individuals in the workplace." 42 U. S. C. § 12113(b) (emphasis added). Little wonder that the Court did not find in that text "an omission [that] bespeaks a negative implication," 536 U. S., at 81. And of course the opinion said nothing about the requirement (central to the Court's analysis today) that it be "fair to suppose that Congress considered the unnamed possibility," *ante,* at 168.

## B

Post-October 1, 1993, initial assignments can also not be reconciled with the Coal Act's provisions regarding appointments to the board of trustees. Section 9702(b)(1)(B) establishes for the Combined Fund a board of seven members, one of whom is to be "designated by the three employers . . . who have been assigned the greatest number of eligible beneficiaries under section 9706." The Act provides for an "initial trustee" to fill this position pending completion of the assignment process, but § 9702(b)(3)(B) permits this initial trustee to serve only "until November 1, 1993." It is evident, therefore, that the "three employers . . . who have been assigned the greatest number of eligible beneficiaries under section 9706" *must* be known by November 1, 1993. It is simply inconceivable that the three appointing employers were to be unknown (and the post left unfilled) until the Commissioner completes an open-ended assignment process—whenever that might be; or that the designated trustee is constantly to change, as the identity of the "three employers . . . who have been assigned the greatest number of eligible beneficiaries under section 9706" constantly changes.

## V

At bottom, the Court's reading of the Coal Act—its confident filling in of provisions to cover "cases not provided for"—rests upon its perception that the statute's overriding goal is accuracy in assignments. That is a foundation of sand. The Coal Act is demonstrably *not* a scheme that requires, or even attempts to require, a perfect match between each beneficiary and the coal operator most responsible for that beneficiary's health care. It provides, at best, rough justice; seemingly unfair and inequitable provisions abound.

When, for example, an operator goes out of business, § 9704(f)(2)(B) provides that beneficiaries previously assigned to that operator must go into the unassigned pool for purposes of calculating the "applicable percentage." It

makes no provision for them to be reassigned to another operator, *even if* another operator might qualify under §§ 9706(a)(1)–(3). That is hardly compatible with a scheme that is keen on "accuracy of assignments," and that envisions perpetual assignment authority in the Commissioner.

To account for the existence of § 9704(f)(2)(B), the Court retreats to the more nuanced position that the Coal Act prefers accuracy over finality only "in the first assignment," *ante,* at 169, n. 12. Why it should have this strange preference for perfection in virgin assignments is a mystery. One might understand insisting upon as perfect a matchup as possible *up to October 1, 1993,* and then prohibiting future changes, both by way of initial assignment or otherwise; that would assure an initial system that is as near perfect as possible, but abstain from future adjustments that upset expectations and render sales of companies more difficult. But what is the conceivable reason for insistence upon perfection in *initial* assignments, whether made *before* the deadline *or afterward?*[4] As it is, however, the Act does *not* insist upon accuracy in initial assignments, not even in those made *before* the deadline. For each assigned beneficiary, only one signatory operator is held responsible for health benefits, *even if* that miner had worked for other signatory operators that should in perfect fairness share the responsibility.

The reality is that the Coal Act reflects a *compromise* between the goals of perfection in assignments and finality. It provides *some* accuracy in initial assignments along with

---

[4] The Court points to § 9706(f)'s review process in support of its view that the Coal Act envisions "accuracy 'in inital assignments, whether made before the deadline or afterward.'" *Ante,* at 169, n. 12 (emphasis deleted). In fact it shows the opposite—reflecting the statute's *tradeoffs* between the competing objectives of accuracy in assignments and finality. Sections 9706(f)(1) and (f)(2) provide time limits for coal operators to request reconsideration by the Commissioner; errors discovered after these time limits have passed are forever closed from correction. (Unless, of course, the Court chooses, in the interest of accuracy in assignments, to ignore those time limits, just as it has ignored the time limit of § 9706(a).)

*some* repose to signatory operators, who are given full notice of their obligations by October 1, 1993, and can plan their business accordingly without the surprise of new (and retroactive) liabilities imposed by the Commissioner. It is naive for the Court to rely on guesses as to what Congress would have wanted in legislation as complicated as this, the culmination of a long, drawn-out legislative battle in which, as we put it in *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 461 (2002), "highly interested parties attempt[ed] to pull the provisions in different directions." The best way to be faithful to the resulting compromise is to follow the statute's text, as I have done above—not to impute to Congress one statutory objective favored by the majority of this Court at the expense of other, equally plausible, statutory objectives.

\* \* \*

I think it clear from the text of § 9706(a) and other provisions of the Coal Act that the Commissioner lacks authority to assign eligible beneficiaries to signatory operators on or after October 1, 1993. I respectfully dissent from the Court's judgment to the contrary.

JUSTICE THOMAS, dissenting.

I fully agree with JUSTICE SCALIA's analysis in these cases and, accordingly, join his opinion. I write separately, however, to reiterate a seemingly obvious rule: Unless Congress explicitly states otherwise, "we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC* v. *Meyer*, 510 U. S. 471, 476 (1994). Thus, absent a congressional directive to the contrary, "shall" must be construed as a mandatory command, see American Heritage Dictionary 1598 (4th ed. 2000) (defining "shall" as (1)a. "Something that will take place or exist in the future . . . . b. Something, such as an order, promise, requirement, or obligation: *You shall leave now. He shall answer for his misdeeds. The penalty shall not exceed two years in prison*"). If Congress desires

for this Court to give "shall" a nonmandatory meaning, it must say so explicitly by specifying the consequences for noncompliance or explicitly defining the term "shall" to mean something other than a mandatory directive. Indeed, Congress is perfectly free to signify the hortatory nature of its wishes by choosing among a wide array of words that do, in fact, carry such meaning; "should," "preferably," and "if possible" readily come to mind.

Given the foregoing, I disagree with *Brock* v. *Pierce County*, 476 U. S. 253 (1986), and its progeny, to the extent they are taken, perhaps erroneously, see *ante*, at 177–179 (SCALIA, J., dissenting), to suggest that (1) "shall" is not mandatory and that (2) a failure to specify a consequence for noncompliance preserves the power to act in the face of such noncompliance, even where, as here, the grant of authority to act is coterminous with the mandatory command. I fail to see any reason for eviscerating the clear meaning of "shall," other than the impermissible goal of saving Congress from its own choices in the name of achieving better policy. But Article III does not vest judges with the authority to rectify those congressional decisions that we view as imprudent.

I also note that, under the Court's current interpretive approach, there is *no penalty at all* for failing to comply with a duty if Congress does not specify consequences for noncompliance. The result is most irrational: If Congress indicates a *lesser* penalty for noncompliance (*i. e.*, less than a loss of power to act), we will administer it; but if there is no lesser penalty and "shall" stands on its own, we will let government officials shirk their duty with impunity.

Rather than depriving the term "shall" of its ordinary meaning, I would apply the term as a mandatory directive to the Commissioner. The conclusion then is obvious: The Commissioner has no power to make initial assignments after October 1, 1993.