# United States Court of Appeals
# for the Federal Circuit

---

**GILDA INDUSTRIES, INC.,**
*Plaintiff-Appellee,*

AND

**NESTLE WATERS NORTH AMERICA, INC.,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2009-1492

---

Appeal from the United States Court of International Trade in Case No. 07-00474, Senior Judge R. Kenton Musgrave.

---

Decided: October 13, 2010

---

PETER S. HERRICK, Peter S. Herrick, P.A., of Miami, Florida, argued for plaintiff-appellee Gilda Industries, Inc.

JONATHAN T. STOEL, Hogan & Hartson LLP of Washington, DC, argued for plaintiff-appellee Nestle Waters North America, Inc. With him on the brief was CRAIG A. LEWIS.

DAVID S. SILVERBRAND, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States.  With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director.

MARK R. SANDSTROM, Law Offices of Mark R. Sandstrom, for amicus curiae Cheese Importers Association of America, Inc.  Of counsel on the brief was JOHN C. STEINBERGER.

––––––––––––––

Before RADER, *Chief Judge*, NEWMAN, AND PLAGER, *Circuit Judges.*

NEWMAN, *Circuit Judge*.

The government appeals from a decision of the Court of International Trade holding that a retaliatory duty order assessing duties against certain imports of Gilda Industries, Inc. had terminated by operation of law.  The Court of International Trade ordered liquidation of Gilda's goods without assessment of the duty, and ordered the government to refund, with interest, the 100 percent ad valorem duty that Gilda paid on products imported after the retaliatory duties expired.[1]  We affirm the judgment.

BACKGROUND

I

The retaliatory measures at issue here were first imposed on July 28, 1999.  The measures were implemented in

––––––––––––––

[1]    *Gilda Indus., Inc. v. United States*, 625 F. Supp. 2d 1377 (Ct. Int'l Trade 2009) (*"Gilda II"*).

response to an import ban adopted by the European Community ("EC") targeting meat products from the United States. Our prior decision on Gilda's earlier challenge to these measures provides a detailed history:

> In December 1985 the European Community prohibited imports of the meat of animals that had been treated with hormones. The United States attempted to negotiate a change in the EC's policy. When those efforts failed, the United States invoked formal dispute settlement proceedings before the World Trade Organization challenging the EC's ban on hormone-treated meat. In 1997 a WTO panel issued a report concluding that the EC's ban was contrary to its WTO obligations because the ban was not based on scientific evidence. The WTO's Dispute Settlement Body subsequently adopted the panel's report. Nevertheless, the EC did not implement the panel's recommendations. As a result, in 1999 the United States requested suspension of the duty concessions that WTO countries are obligated to grant to one another. The EC objected, and the matter was referred for arbitration. On July 12, 1999, the WTO arbitrator determined that the United States had suffered impairment as a result of the EC's ban and therefore authorized the United States to increase its duties on EC products.

> Pursuant to section 301 of the Trade Act of 1974, the United States Trade Representative has authority to take certain retaliatory measures when this country's trade rights are violated by another country. In particular, 19 U.S.C. § 2416 authorizes the Trade Representative to create "retaliation lists," which subject certain products of the target countries to increased duties. On March 25, 1999,

the Trade Representative published notice of his intention to implement retaliatory measures against the EC pursuant to the WTO dispute settlement agreement. *Implementation of WTO Recommendations Concerning EC-Measures Concerning Meat and Meat Products (Hormones)*, 64 Fed. Reg. 14,486 (Mar. 25, 1999). After a notice and comment period for the proposed retaliatory measures, the Trade Representative adopted a retaliation list and subjected all the products on the list to a 100 percent ad valorem duty. Among the listed products were those falling under [Harmonized Trade Schedule of the United States] subheading 9903.02.35, which encompasses "[r]usks, toasted bread and similar products."

*Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1274–75 (Fed. Cir. 2006) ("*Gilda I*").

Gilda imports toasted breads from Spain, and has been paying the retaliatory duty on these imports since 1999. This court has explained that 19 U.S.C. §2417(c)(1) "provides that actions taken under section 2411 (e.g., implementation of a retaliation list) terminate after four years unless a representative of the domestic industry 'which benefits from' the action submits a written request for continuation of the action." *Gilda I*, 446 F.3d at 1277–78. Prior to the end of the first four-year period in 2003, representatives of the domestic beef industry submitted written requests for continuation of the list. Gilda brought suit to challenge the retaliation list. Gilda argued that despite the beef industry's request for continuation of the retaliation list, the list nonetheless terminated because the domestic beef industry "is not an industry 'which benefits from' the retaliation list. Gilda contend[ed] that the domestic beef industry cannot be said to be a beneficiary of the retaliation list unless and

until the EC responds to the retaliatory measure by complying with the WTO settlement agreement." *Id.* at 1278. This court rejected that argument in *Gilda I*, and held that the requests for continuation of the retaliatory action by representatives of the United States beef industry prevented termination of the retaliation under §2417(c). *Id.*

II

Gilda brought the present action against the United States in December 2007, after another four-year period had passed since the implementation of the retaliatory list. No requests for continuation of the retaliatory action were received by the Trade Representative during this second four-year period. Thus, Gilda argued that the retaliation had terminated pursuant to 19 U.S.C. §2417(c) on July 29, 2007. The government moved to dismiss Gilda's case for failure to state a claim upon which relief could be granted. The government argued that §2417(c) applied only to the first four-year period after imposition of retaliatory duties. Specifically, the government contended that §2417(c)(1)(A)'s phrase "a particular action . . . under section 2411" referred only to the initial "action" undertaken by the Trade Representative to impose the retaliation list, and that "actions taken pursuant to section 2411 do not include the *continuation* of a particular action under section 2411." *Gilda Indus., Inc. v. United States*, 556 F. Supp. 2d 1366, 1377 (Ct. Int'l Trade 2008) ("*Order on Motion to Dismiss*"). Because the Trade Representative had taken no action during the second four-year period other than to continue the retaliation list, the government argued that there was no action to terminate under §2417(c). The Court of International Trade rejected this argument and denied the government's motion to dismiss. The court found no support in the text of the statute for the government's interpretation, and found that the legislative history supported a contrary interpretation.

The court also reasoned that "[b]ecause an action cannot terminate unless the action is somehow continuing, the court is unable to accept that the 'action' to which the statute refers is not a continuing one." *Id.* at 1378. The government has not appealed this ruling by the trial court.

After the denial of the government's motion to dismiss, Gilda moved for summary judgment on its claim. Before considering the motion, the Court of International Trade granted the government's request for a remand to the Trade Representative to re-evaluate its position in view of the court's interpretation of §2417(c) in the *Order on Motion to Dismiss*. The Trade Representative determined that the retaliation list did not terminate because the Trade Representative had not complied with 19 U.S.C. §2417(c)(2), which requires the Trade Representative to notify representatives of the domestic industry of any impending termination under §2417(c)(1) at least 60 days before termination. The Trade Representative provided notice to United States beef industry representatives (long after the time required by statute), and the domestic industry requested continuation of the retaliatory measures.

The Trade Representative determined that "the only reason that representatives of the U.S. beef industry did not formally request continuation of the July 1999 action 60 days prior to the eight-year anniversary of the July 1999 action was that USTR . . . had not provided the notification" required by §2417(c)(2). Susan C. Schwab, U.S. Trade Representative, Exec. Office of The President, *Remand Results* 1 (Jan. 14, 2009) (J.A. 37). The Trade Representative concluded that the lack of notice "must lead to an extension" such that the late requests by the domestic beef industry representatives "foreclose the possibility of a termination of the July 1999 action." *Id.* at 2 (J.A. 38). The Trade Representative also modified the retaliation list,

removing Gilda's products and adding those of plaintiff Nestle Waters North America, Inc.

The Court of International Trade then considered Gilda's summary judgment motion, which had been partially mooted with respect to Gilda by the Trade Representative's removal of Gilda's products from the retaliation list. The court concluded that the lack of notice under 19 U.S.C. §2417(c)(2) did not preclude automatic termination of the retaliatory duties under §2417(c)(1). The court reasoned that

> [t]he text of section (c)(1) is conspicuously devoid of any reference to actions by, or the discretion of, the USTR. Although sections (c)(2) and (c)(3) impose other requirements on the USTR, those provisions are listed separately from, and follow after, the automatic termination provision; nothing in the text of the statute indicates that the USTR's failure to perform the duties outlined in section (c)(2) or (c)(3) in any way affects the automatic termination provision contained in section (c)(1).

*Gilda II*, 625 F. Supp. 2d at 1383. The court rejected the government's additional arguments based on policy and equitable tolling of the statute. Thus, the court granted summary judgment in favor of Gilda. The government appeals.

## DISCUSSION

"In reviewing the grant of summary judgment on the administrative record, we reapply the standard of review that the Court of International Trade applied." *Corus Group PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1360 (Fed. Cir. 2003). The Court of International Trade had

jurisdiction under 28 U.S.C. §1581(i) to review the Trade Representative's actions implicated here. *See Gilda I*, 446 F.3d at 1277. The applicable standard of review is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. §706. *See* 28 U.S.C. §2640(e) ("In any civil action not specified in this section, the Court of International Trade shall review the matter as provided in section 706 of title 5."); *Shakeproof Industrial Prods. Div. Of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997) (explaining that under 28 U.S.C. §2640(e) the "Administrative Procedure Act standard of review applies to civil actions brought under 28 U.S.C. §1581(i)"). Accordingly, "[t]o the extent necessary to decision and when presented," this court must "decide all relevant questions of law, interpret constitutional and statutory provisions," and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706.

In addition, this court affords substantial deference to decisions of the Trade Representative implicating the discretionary authority of the President in matters of foreign relations. *See Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) ("In international trade controversies of this highly discretionary kind -- involving the President and foreign affairs -- this court and its predecessors have often reiterated the very limited role of reviewing courts. For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." (citations omitted)). However, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). "If the intent of Congress is clear, that is the end of the matter; for

the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.

Here, the intent of Congress is expressed clearly in the text of 19 U.S.C. §2417(c):

(c) Review of necessity

(1) If--

> (A) a particular action has been taken under section 2411 of this title during any 4-year period, and

> (B) neither the petitioner nor any representative of the domestic industry which benefits from such action has submitted to the Trade Representative during the last 60 days of such 4-year period a written request for the continuation of such action,

such action shall terminate at the close of such 4-year period.

(2) The Trade Representative shall notify by mail the petitioner and representatives of the domestic industry described in paragraph (1)(B) of any termination of action by reason of paragraph (1) at least 60 days before the date of such termination.

(3) If a request is submitted to the Trade Representative under paragraph (1)(B) to continue taking a particular action under section 2411 of this title, the Trade Representative shall conduct a review of--

(A) the effectiveness in achieving the objectives of section 2411 of this title of--

(i) such action, and

(ii) other actions that could be taken (including actions against other products or services), and

(B) the effects of such actions on the United States economy, including consumers.

In particular, subsection (1) provides that if the petitioner or any domestic industry representative does not request to continue retaliatory action during the last 60 days of any 4-year period following the implementation of the retaliatory action, "such action shall terminate at the close of such 4-year period." When a statute directs that a certain consequence "shall" follow from specified contingencies, the provision is mandatory and leaves no room for discretion. This principle was reiterated in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). The Court explained that:

> Section 402(b) of the [Clean Water Act] provides, without qualification, that the EPA "shall approve" a transfer application unless it determines that the State lacks adequate authority to perform the nine functions specified in the section. 33 U.S.C. § 1342(b). By its terms, the statutory language is mandatory and the list exclusive; if the nine specified criteria are satisfied, the EPA does not have the discretion to deny a transfer application. *Cf. Lopez v. Davis*, 531 U.S. 230, 241, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001) (noting Congress' "use of a mandatory ' shall' . . . to impose discretionless obliga-

tions"); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) ("[T]he mandatory ' shall' . . . normally creates an obligation impervious to judicial discretion"); *Association of Civilian Technicians v. FLRA*, 22 F.3d 1150, 1153 (C.A.D.C.1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive"); Black's Law Dictionary 1375 (6th ed. 1990) ("As used in statutes . . . this word is generally imperative or mandatory").

*Id.* at 661–62. Thus, the retaliatory action at issue here terminated by operation of law on July 29, 2007, for it is undisputed that no requests for continuation of the retaliatory list were received within the 60-day window specified by §2417(c)(1).

No other provision alters the effect of §2417(c)(1)'s automatic termination provision. The government emphasizes the court's obligation to "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotations and citations omitted). According to the government, interpreting §2417(c) as a "harmonious whole" means that if the Trade Representative does not comply with the obligation under §2417(c)(2) to notify the domestic industry of an impending termination pursuant to §2417(c)(1), the retaliatory action will not terminate. We cannot agree. The statute fails to specify such a consequence. The lack of a specified consequence in this provision is not an interpretive gap to be filled by the Trade Representative, and even if it were, construing subsection (c)(2) in contravention of subsection (c)(1) would not

be reasonable or permissible. Rather, the absence of a consequence indicates, as *amicus curiae* Cheese Importers Association of America, Inc. points out, that subsection (c)(2) is a directory provision and not "mandatory." Subsection (c)(2) is likely meant to "spur the [Trade Representative] to action," *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) (quoting *Brock v. Pierce County*, 476 U.S. 253, 265 (1986)), and the "failure to specify a consequence for noncompliance" can "impl[y] that Congress intended the responsible officials administering the Act to have discretion to determine what disciplinary measures are appropriate when their subordinates fail to discharge their statutory duties," *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 64–65 (1993).

The government argues that treating noncompliance with the notice provision of subsection (c)(2) as irrelevant to automatic termination under subsection (c)(1) impermissibly renders subsection (c)(2) inoperative. That is not the effect of our interpretation. Subsection (c)(2) means what it says, and is meant to be complied with. We assume that a party with standing could bring an APA action to compel the Trade Representative to provide the statutory notice. *Cf. Pierce County*, 476 U.S. at 260 n.7 ("Thus, it would appear that a complainant adversely affected by the Secretary's failure to act on a complaint could bring an action in the district court. The court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' §706(1)."). However, nothing in the text of surrounding provisions or overall policy of the statute suggests a congressional intent to have termination by operation of law (subsection (c)(1)) hinge on whether the Trade Representative provides timely notice of impending termination (subsection (c)(2)).

As the Court of International Trade observed, "other provisions contained in section 301 [of the Trade Act of 1974] expressly provide that some of the USTR's actions *are contingent* upon an actual consultation with the domestic industry (which entails, at the very least, notice) and *do* involve the USTR's discretion." *Gilda II*, 625 F. Supp. 2d at 1383 (citing 19 U.S.C. §§2417(a)(2), 2416(b)). The absence of such a statutory dependence between subsections (c)(1) and (c)(2) therefore indicates that noncompliance with the notice provisions will not affect termination under §2417(c)(1). The Supreme Court has recognized other instances in which there is virtually no consequence for noncompliance with a statutory timing provision that does not specify a consequence for missing the deadline. *See, e.g.*, *Dolan v. United States*, 560 U.S. __, 130 S. Ct. 2533, 2538 (2010) ("In still other instances, we have found that a deadline seeks speed by creating a time-related directive that is legally enforceable but does not deprive a judge or other public official of the power to take the action to which the deadline applies if the deadline is missed. *See, e.g.*, *United States v. Montalvo Murillo*, 495 U.S. 711, 722 (1990) (missed deadline for holding bail detention hearing does not require judge to release defendant); *Brock v. Pierce County*, 476 U.S. 253, 266 (1986) (missed deadline for making final determination as to misuse of federal grant funds does not prevent later recovery of funds); *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 171–72 (2003) (missed deadline for assigning industry retiree benefits does not prevent later award of benefits)."). Here, Congress could reasonably intend to increase the likelihood of receiving continuation requests by obligating the Trade Representative to provide notice to the domestic industry, but also intend for retaliatory action to terminate automatically if no requests for continuation are received, even in the absence of notice from the Trade Representative.

The government observes that termination of retaliatory action without notice does not serve the interests of the domestic industry, and argues that §2417(c) is meant to protect such interests. If the domestic industry requests continuation, then the Trade Representative has discretion under §2417(c)(3) to determine whether continuation of the retaliatory action is in the best overall interest of the United States economy and consumers. The interests of the domestic industry cannot override the clear language of the statute or the other interests that the text suggests are intended to be considered. Because we conclude that Congress did not intend that the domestic industry be excused from requesting continuation of retaliatory action in the absence of notice from the Trade Representative, we also do not accept the government's position that this interpretation of the statute imposes on the domestic industry additional burdens not contemplated by Congress.

As an alternative basis for reversal, the government argues that even if §2417(c) is construed such that failure to notify will not generally prevent termination, it should prevent termination in this case because the Trade Representative's failure to notify was caused by an incorrect interpretation of the statute. The government asserts that the Trade Representative and domestic industry did not interpret §2417(c)(1) to be applicable beyond the first four-year period after imposition of retaliatory duties. The government states that it held this view until the Court of International Trade held that §2417(c)(1) could operate to terminate retaliatory action in any subsequent four-year period, *see Order on Motion to Dismiss*, 556 F. Supp. 2d at 1377–78. After learning the correct interpretation, the Trade Representative provided the notice and the domestic industry requested continuation of the retaliatory action. Thus, according to the government, the failure to notify was excusable and should therefore prevent termination.

In pursuing this argument, the government relies on *Amber Resources Co. v. United States*, 538 F.3d 1358 (2008). As the Court of International Trade recognized, *Amber Resources* is inapplicable. In *Amber Resources* the government had granted leases to private entities to explore for and develop oil and gas resources off the California coast, and "because of court decisions construing a 1990 statute that was enacted after the leases were in place, the government took action that had the effect of preventing the lessees from continuing exploratory activities on the leased properties, at least temporarily." *Id.* at 1362. This court held that "[b]ecause the parties to the lease agreements all treated the agreements as unaffected by the 1990 [statute], we conclude that the 1990 enactment itself did not constitute either a breach or an anticipatory repudiation that gave the lessees a right to restitution at that time." *Id.* at 1369–70. Because the government did not treat the statute as applicable to the leases until courts construed it as such, "[i]t was only at that point that the government can be said to have repudiated the lease agreements by putting into practice the new rules" preventing enjoyment of the lease. *Id.* at 1370.

The government asserts that *Amber Resources* broadly held that "where parties 'right[ly] or wrong[ly]' interpret a statutory provision one way, only to learn through an intervening court decision that the court views the provision differently, the court's decision should become the operative time from which the parties should be on notice of the correct interpretation. Nothing in *Amber* purports to limit this principle to concepts unique to contract law." Gov't Br. 26–27 (quoting *Amber Resources*, 538 F.3d at 1370) (alteration in original). To the contrary, the holding in *Amber Resources* is explicitly tied to its context. The *Amber Resources* court explains the general rule that "court decisions construing statutes are typically viewed as not changing the

law but merely announcing what the law has meant since its enactment," but then states that this rule is not useful "in a case such as this one." 538 F.3d at 1370. The entire discussion of how the parties interpreted the statute is in the context of contract repudiation and breach and is analyzed with these concepts in mind. *See id.* ("It would ignore the reality of the situation in this case to suggest that the interpretation of the 1990 CZMA amendments, as ultimately announced by the courts more than a decade later, was clear to the parties from the moment of enactment or that the governing principles of contract law should be applied as if it were. The fact of the matter is that, right or wrong, the parties interpreted the 1990 CZMA amendments in a way that would not have resulted in a breach.").

Apart from the contract-specific language in *Amber Resources*, the government's proposed expansion of *Amber Resources* would change existing law and eliminate remedies for any party affected by the misinterpretation of a statute. Even if *Amber Resources* could be stretched to excuse noncompliance with the notice provisions of §2417(c)(2), such noncompliance still could not prevent the mandatory termination of the retaliatory action effected by §2417(c)(1).

For the foregoing reasons, the judgment of the Court of International Trade is affirmed.

**AFFIRMED**