# United States Court of Appeals for the Federal Circuit

---

**HITACHI HOME ELECTRONICS (AMERICA), INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,
UNITED STATES CUSTOMS AND BORDER
PROTECTION,**
AND **ROSA HERNANDEZ, Port Director,
United States Customs and Border Protection,**
*Defendants-Appellees.*

---

2010-1345

---

Appeal from the United States Court of International Trade in case no. 09-CV-0191, Chief Judge Jane A. Restani.

---

Decided: October 31, 2011

---

SIDNEY N. WEISS, of New York, New York, argued for plaintiff-appellant. With him on the brief was STEVEN B. ZISSER, Zisser Customs Law Group, PC, of San Diego, California.

BARBARA S. WILLIAMS, Attorney in Charge, International Trade Field Office, Civil Division, Commercial Litigation Branch, United States Department of Justice, of New York, New York, argued for the defendants-appellees. With her on the brief were JUSTIN R. MILLER; and TONY WEST, Assistant Attorney General, and JEANNE E. DAVIDSON, Director, of Washington, DC.

_____

Before BRYSON, LINN, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LINN.

Dissenting opinion filed by *Circuit Judge* REYNA.

LINN, *Circuit Judge.*

Hitachi Home Electronics (America), Inc. ("Hitachi") appeals from the Court of International Trade's dismissal for lack of jurisdiction of its action seeking duty-free treatment of certain plasma flat panel televisions made or assembled in Mexico and imported into the United States and seeking recovery of tariffs paid thereon. Because the Court of International Trade correctly determined that it lacked jurisdiction, this court affirms.

## I. BACKGROUND

Hitachi imported certain plasma flat panel televisions made or assembled in Mexico between June 1, 2003, and December 27, 2005. *Hitachi Home Elecs. (America), Inc. v. United States*, 704 F. Supp. 2d 1315, 1315-16 (CIT 2010). These televisions were liquidated as dutiable under subheading 8528.12.72 of the Harmonized Tariff Schedule of the United States at a rate of 5.0% ad valorem. *Id.* at 1316. Hitachi claims that the televisions should be treated as duty-free under the North American Free Trade Agreement. *Id.* Hitachi filed numerous

protests with United States Customs and Border Protection ("Customs"), followed by actions in the Court of International Trade. *Id.* at 1316-17.

On March 6, 2007, Hitachi filed its protest as to tariffs paid on televisions imported between November 19 and December 27, 2005. *Id.* at 1317. In May 2009, Hitachi filed an action in the Court of International Trade asserting jurisdiction under 28 U.S.C. § 1581(a). *Id.* Hitachi contended that its protest was denied or deemed denied under 19 U.S.C. § 1515(a) because Customs had taken more than two years to act on its protest, or under 28 U.S.C. § 1581(i) if there was no jurisdiction under § 1581(a). *Id.* Customs moved to dismiss for lack of jurisdiction and Hitachi cross-moved to consolidate that case with other pending cases and for summary judgment. *Id.* at 1317-18. Hitachi then argued that jurisdiction was proper under § 1581(i) and that Hitachi was entitled to recover the amounts protested because Hitachi's protests were allowed by operation of law when Customs failed to act within the two-year period required by § 1515(a). *Id.*

The Court of International Trade dismissed for lack of jurisdiction, interpreting § 1515(a) to impose neither automatic allowance nor automatic denial of a protest, and concluding that jurisdiction was therefore not proper under § 1581(a) or (i). *Id.* at 1319-22. The Court of International Trade noted that all Hitachi needed to do in order to establish jurisdiction was to file for accelerated disposition under 19 U.S.C. § 1515(b) and wait for a maximum of thirty days. *Id.* at 1320.

Hitachi timely appealed the dismissal and this court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

II. Discussion


A. Standard of Review


This court reviews the Court of International Trade's decision to dismiss for lack of jurisdiction *de novo*. *Xerox Corp. v. United States*, 423 F.3d 1356, 1359 (Fed. Cir. 2005). The Court of International Trade based its decision on its interpretation of 19 U.S.C. §§ 1514 and 1515 and 28 U.S.C. § 1581, which interpretation this court also reviews *de novo*. *Id.* at 1359; *Goodman Mfg., L.P. v. United States*, 69 F.3d 505, 508 (Fed. Cir. 1995).


B. Possible Statutory Bases for Jurisdiction


Two provisions of 28 U.S.C. § 1581 are relevant to Hitachi's claim to jurisdiction in the Court of International Trade. Section 1581(a) provides (emphasis added): "The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the *denial* of a protest, in whole or in part, under § 515 of the Tariff Act of 1930." This section is the basis of what now appears to be Hitachi's alternative argument for jurisdiction, which we address briefly after addressing Hitachi's main argument. More relevant to Hitachi's appeal is § 1581(i), a catchall jurisdictional clause which provides in relevant part:

> [T]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of mer-

chandise for reasons other than the rais-
ing of revenue . . . .

Hitachi's appeal turns on the question of whether, if
Customs fails to allow or deny a protest within the two-
year period provided by 19 U.S.C. § 1515(a), the protest is
deemed allowed by operation of law and Customs' power
to act on the protest is expired, and whether § 1581(i)
therefore provides jurisdiction for Hitachi to recover the
duties subject to the protest.

## C. Allowance by "Operation of Law"

While this court has not previously decided whether
§ 1515(a) causes all claims not denied within the two-year
period to be allowed by operation of law, we do so now
with ample guidance from the Supreme Court and our
own precedent. For the reasons discussed below, we hold
that it does not, and that Hitachi therefore failed to
establish jurisdiction under § 1581(i).

### 1. Time Limits, Mandatory and Directory

The Supreme Court has "long recognized that many
statutory requisitions intended for the guide of officers in
the conduct of business devolved upon them . . . do not
limit their power or render its exercise in disregard of the
requisitions ineffectual." *United States v. James Daniel
Good Real Prop.*, 510 U.S. 43, 63 (1993) (quotation omit-
ted). Thus, "if a statute does not specify a consequence for
noncompliance with statutory timing provisions, the
federal courts will not in the ordinary course impose their
own coercive sanction." *Id.* In *James Daniel Good*, the
Supreme Court explained that "the failure of Congress to
specify a consequence for noncompliance with the timing
requirements [of the statute at issue] implies that Con-
gress intended the responsible officials . . . to have discre-

tion to determine what disciplinary measures are appropriate when their subordinates fail to discharge their statutory duties." *Id.* at 64-65.

In *Brock v. Pierce County*, 476 U.S. 253, 266, 260 (1986), in holding that the Comprehensive Employment and Training Act's "requirement that the Secretary 'shall' take action within 120 days does not, standing alone, divest the Secretary of jurisdiction to act after that time," the Supreme Court observed that "[w]hen, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *See also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) ("Nor, since *Brock*, have we *ever* construed a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later." (emphasis added)); *Regions Hosp. v. Shalala*, 522 U.S. 448, 459 n.3 (1998) (where statute contained "shall report" provision and Secretary "[m]iss[ed] the deadline by some years," the "failure to meet the deadline, a not uncommon occurrence when heavy loads are thrust on administrators, [did] not mean that official lacked power to act beyond it").

In *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990), the Supreme Court interpreted a provision of the Bail Reform Act that reads, in relevant part:

> DETENTION HEARING. – The judicial officer shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person . . .
>
> The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or

> the attorney for the Government, seeks a
> continuance . . . .

*Id.* at 714.  In *Montalvo-Murillo*, "[t]he sole question
presented on certiorari [was] whether . . . [the detainee]
must be released as a remedy for the failure to hold a
hearing at his first appearance."  *Id.* at 716.  Applying
*Brock*, the Supreme Court held that "the word 'shall' in
the Act's hearing time requirement does not operate to
bar all authority to seek pretrial detention once the time
limit has passed. Although the duty is mandatory, the
sanction for breach is not loss of all later powers to act."
*Id.* at 718.  As the Supreme Court further explained:

> There is no presumption or general rule
> that for every duty imposed upon the court
> or the Government and its prosecutors
> there must exist some corollary punitive
> sanction for departures or omissions, even
> if negligent . . . [and w]e do not agree that
> we should, or can, invent a remedy to sat-
> isfy some perceived need to coerce the
> courts and the Government into complying
> with the statutory time limits.

*Id.* at 717, 721.

By contrast, 18 U.S.C. § 3162(a)(2) is a statute that
actually states a consequence for failure to comply with a
time limit: "If a defendant is not brought to trial within
the time limit required . . . the information or indictment
shall be dismissed on motion of the defendant."  The
Supreme Court has confirmed that "[t]he sanction for a
violation of the [Speedy Trial] Act is dismissal . . . ."
*Zedner v. United States*, 547 U.S. 489, 509 (2006).  Thus,
the Supreme Court has amply distinguished between
statutes that impose consequences and statutes that do
not.

And this court has consistently followed Supreme Court precedent in deciding whether particular statutes impose consequences for failure to comply with statutory time limits. In *Canadian Fur Trappers Corp. v. United States*, 884 F.2d 563 (Fed. Cir. 1989), Customs failed to liquidate certain entries within a 90-day period, established by 19 U.S.C. § 1504(d), following the lifting of a suspension of liquidation. *Id.* at 566. The parties argued that "once [Customs] fails to complete the liquidation within the 90 day period, the articles must be *deemed liquidated* at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer." *Id.* (emphasis added). This court observed that "[w]hile Congress included the operative language 'deemed liquidated' in [other parts of § 1504], no such consequential language appears in the [relevant section and . . .] the lack of consequential language . . . if [Customs] does not meet that time frame leads us to conclude that Congress intended this part . . . to be only directory." *Id.*; *see also U.S. Tsubaki, Inc. v. United States.*, 512 F.3d 1332, 1334 (Fed. Cir. 2008) (same); *Am. Permac, Inc. v. United States*, 191 F.3d 1380, 1382 (Fed. Cir. 1999) (same).

In *Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368 (Fed. Cir. 2002), this court surveyed precedent including *James Daniel Good*, *Montalvo-Murillo*, and *Brock*, and stated that "[o]ur own precedent has faithfully applied this rule of law as formulated by the Supreme Court . . . that, 'even in the face of a statutory timing directive, when a statute does not specify the consequences of non-compliance, courts should not assume that Congress intended that the agency lose its power to act.'" *Id.* at 1376-77 (quoting *Kemira Fibres Oy v. United States*, 61 F.3d 866, 871 (Fed. Cir. 1995)); *see also Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1365 (Fed. Cir 2010) ("[A]bsence of a consequence [in the statute] indicates . . .

that [the relevant subsection] is a directory provision and not 'mandatory.'").

This court therefore addresses the present question respecting § 1515(a) in view of the great weight of precedent that when Congress intends there to be consequences for noncompliance with statutory deadlines for government action, it says so expressly. [1]

2. No Automatic Allowance Under 19 U.S.C. § 1515(a)

i. The Plain Terms of Section 1515(a)

Hitachi argues that its protest was allowed by operation of law when Customs failed to allow or deny it within the statutory time limit of two years. According to Hitachi, "the plain meaning of the statute is that any protest not expressly denied by Customs within two years is allowed by Customs." Appellant Br. 11 (capitalization removed).

19 U.S.C. § 1515(a) provides in relevant part (emphases added):

> Unless a request for an accelerated disposition of a protest is filed in accordance with subsection (b) of this section the ap-

---

[1] The dissent argues that the cited cases involving directory time limits do not apply because of the shorter time limits they address. But these cases do not establish that long time limits are mandatory and short time limits are directory. Nor is there anything in any of these cases from which to infer such a conclusion simply because of the coincidence of the relatively short time periods involved. To the contrary, what the cases do make clear is that courts should not assume that Congress intended there to be a consequence when the statute does not expressly so state.

propriate customs officer, within two years
from the date a protest was filed in accor-
dance with section 1514 of this title, shall
review the protest and *shall allow or deny*
such protest in whole or in part. Thereaf-
ter, any duties, charge, or exaction *found*
to have been assessed or collected in ex-
cess shall be remitted or refunded and any
drawback found due shall be paid . . . .
Notice of the denial of any protest shall be
mailed . . . [and] shall include a statement
of the reasons for the denial, as well as a
statement informing the protesting party
of his right to file a civil action contesting
the denial of a protest . . . .

According to Hitachi, the use of the phrase "shall al-
low or deny" in § 1515(a) means that in the absence of any
express denial, a protest is automatically allowed after
two years have passed.

Nothing in the language of § 1515(a) supports Hi-
tachi's position. While the statute contains the word
"shall," all of the cases discussed above make clear that
this is not enough to impose a specific penalty for non-
compliance. There is no statement of any consequence in
the event that Customs does not act.

Hitachi's argument is premised on the view that the
same statutory language which establishes that Com-
merce must act within two years *also* establishes the
consequence of inaction because § 1515(a) "does not offer
Customs the option of permitting the protest to go unde-
cided." Appellant Br. 12. But this argument, if true,
would mean that there is no such thing as a directory
provision because every expired statutory time limit
would be deemed to have been satisfied "by operation of
law."

Hitachi attempts to avoid the precedent cited above by arguing that "allow" does not require any action by Customs because "allow" can simply mean to permit to happen by doing nothing. Hitachi supports this position by arguing that § 1515(a) specifically establishes that denials require Customs to give formal notice whereas allowances do not require Customs to do anything. But the statute says "allow or deny" with no indication that either result is caused by inaction. Moreover, § 1515(a) actually contains two distinct and parallel statements of what Customs is required to do in the event that it allows or denies a protest respectively: give back excess money if it allows the protest or explain its reasons if it denies the protest. Both of these requirements are *equally* predicated on Customs having affirmatively done something: to wit, allow or deny a protest. 19 U.S.C. § 1515(a). Hitachi's "allow means do nothing" argument is therefore unhelpful.

Moreover, § 1515(a) requires the refund of money "*found* to have been assessed or collected in excess" (emphasis added). Thus the statute predicates allowance on an affirmative *finding* of excessive payment. Hitachi's rule, it appears, would require this court to adopt a further rule that § 1515(a) allows for Customs to *find* excessive payment "by operation of law." We decline to adopt such a rule.

### ii. Relevance of Section 1515(b)

Hitachi's reading of § 1515(a) is further rebutted by the following subsection, 1515(b), which provides (emphases added):

> A request for accelerated disposition of a protest filed in accordance with section 1514 of this title may be mailed . . . *any time* concurrent with or following the fil-

ing of such protest. For purposes of section 1581 of Title 28, a protest which *has not been allowed or denied* in whole or in part within thirty days following the date of mailing . . . of a request for accelerated disposition shall be *deemed denied* on the thirtieth day following mailing of such request.

The related regulation, 19 C.F.R. § 174.22(d), provides (emphases added):

If the port director *fails to allow or deny* a protest which is the subject of a request for accelerated disposition within 30 days from the date of mailing of such request, the protest shall be *deemed to have been denied* at the close of the 30th day following such date of mailing.

Section 1515(b) disproves Hitachi's reading of § 1515(a). First, it shows an example of a specific time limit (thirty days) with a specific consequence (deemed denial). And it does so in the very next subsection following that into which Hitachi wishes to read a consequence that is not there. Thus, it is not necessary to guess about how Congress would have written an express consequence into § 1515 because that is exactly what Congress did. Second, § 1515(b) establishes that a protest can be denied, at least for jurisdictional purposes, by *inaction* and without any notice.

Also, § 1515(b) defeats Hitachi's argument by proving that Congress actually did provide a specific remedy, at the option of the importer, to obtain jurisdiction a mere thirty days after filing its protest and any other time it wishes after that. Moreover, the specific remedy that Congress intended to provide, which it did expressly, was

not a deemed allowance but a deemed *denial*—which casts an especially ironic light on Hitachi's argument that subsections 1515(a) and (b) must be interpreted "*in pari materia.*" Appellant Br. 19.

Hitachi next argues that using § 1515(b) to obtain jurisdiction under § 1581(a) does not provide an adequate remedy because § 1515(b) is no longer available after the two-year period has expired. For at least the following reasons, Hitachi's argument is wrong.

First, Hitachi's view that expiry of the two-year period eliminates the § 1515(b) option contradicts the plain language of that provision, which expressly states that the option is available "*any time* concurrent with or following the filing of [a] protest" (emphasis added).

Second, the supposed expiry of § 1515(b) is *premised* on Hitachi's claim that § 1515(a) automatically allows all pending protests after two years and deprives Customs of the power to act on them: "[O]nce the protest is two or more years old there is nothing left to 'accelerate.'" Appellant Br. 20. Hitachi's argument thus appears to be that § 1515(a) must automatically allow protests after two years because § 1515(b) no longer applies after two years because § 1515(a) automatically allows protests after two years. The circularity of Hitachi's reasoning is self-evident.

### iii. Legislative History

Hitachi also argues that the legislative history supports its reading of § 1515(a). Hitachi relies heavily upon the fact that Congress rejected the Government's proposal for deemed denial to be the express consequence of a two-year delay. Hitachi cites a number of passages from the legislative history that support the (undisputed) view that Customs is required to act within two years, and that §

1515(b) safeguards access to judicial review. But none of this speaks directly to whether § 1515(b) is available after two years have elapsed, or to whether there is a *consequence* when Customs fails to meet the required deadline.

Thus, Hitachi's legislative history argument is essentially just that the removal of the proposed constructive-denial provision in favor of an express notice requirement, along with the absence of a formal notice of allowance requirement, must mean that Congress intended protests to be deemed allowed after two years. Hitachi's reading of the legislative history stands or falls with its reading of the statute itself, and is contrary to the precedent discussed above. If Congress intended, in abandoning one automatic provision, to adopt another *opposite* automatic provision, it would presumably have mentioned its intent somewhere in the legislative history, to say nothing of the statute itself.

Hitachi has identified nothing in the legislative history to compel reading "deemed allowance" into § 1515(a)—whose plain terms lack any such consequence—and this court therefore declines to do so.[2]

---

[2] The dissent relies heavily on the legislative history to the same end as Hitachi. First, the statute unambiguously lacks any "deemed allowance" provision. And "we need not resort to legislative history when a statute is unambiguous." *Pequignot v. Solo Cup Co.*, 608 F.3d 1356, 1361-62 (Fed. Cir. 2010). Moreover, the dissent cites no passage in all the legislative history that can be fairly read as a statement of Congressional intent to treat stale claims as allowed by operation of law. Rather, the dissent argues convincingly what is not in dispute: that Congress's adoption of the current statute was a rejection of automatic denial. The dissent's argument appears to be predicated on an unstated and false premise that Congress had only two choices—automatic denial and automatic allowance—and that if Congress rejected one, it

### iv. No Automatic Allowance and No Section 1581(i) Jurisdiction

Hitachi asks this court to ignore the weight of precedent, the plain language of the statute, and the conspicuous absence of any expression of Congressional intent to create an implied automatic allowance provision. We hold that Customs' failure to act on a protest within the two-year period specified in 19 U.S.C. § 1515(a) does not result in a deemed allowance by operation of law.

Hitachi's primary argument that jurisdiction is proper under § 1581(i) is premised on the conclusion that § 1515(a) has already allowed Hitachi's protest by operation of law. Section 1581(i) only provides jurisdiction in cases where the other provisions of § 1581 do not provide jurisdiction. *See Miller & Co. v. United States*, 824 F.2d 961, 963 (Fed. Cir. 1987) ("Section 1581(i) jurisdiction may not be invoked when jurisdiction under another subsection of § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate."). Because Hitachi's claim had not already been allowed or denied, Hitachi could have sought accelerated disposition at any time, waited thirty days, and established jurisdiction under § 1581(a). Therefore jurisdiction under § 1581(a) is not "manifestly inadequate" and jurisdiction under § 1581(i) is improper. The Court of International Trade correctly found that it lacked jurisdiction under § 1581(i).

### D. No Other Basis for Jurisdiction

Hitachi argues that if its protest was not allowed by operation of law, then it is nevertheless entitled to juris-

---

necessarily adopted the other. In reality, Congress faced no such dilemma.

diction under § 1581(a) or (i) because otherwise it will be deprived of its right to judicial review due to Customs' refusal to act. This argument ignores the remedy available to Hitachi under § 1515(b) and is therefore without merit.

## III. CONCLUSION

For the foregoing reasons, the Court of International Trade's dismissal for lack of jurisdiction is affirmed.

## AFFIRMED

# United States Court of Appeals for the Federal Circuit

---

**HITACHI HOME ELECTRONICS (AMERICA), INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,
UNITED STATES CUSTOMS AND BORDER
PROTECTION,** AND
**ROSA HERNANDEZ, PORT DIRECTOR, UNITED
STATES CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellees.*

---

2010-1345

---

Appeal from the United States Court of International Trade in Case No. 09-Cv-0191, Chief Judge Jane A. Restani.

---

REYNA, *Circuit Judge*, dissenting.

I believe that 19 U.S.C. § 1515(a) requires Customs to act on the merits of all protests within two years, and that all protests not expressly denied within that two-year period are allowed by operation of law. Because I would find Hitachi's protests at issue were therefore allowed but its duties were not refunded, I would reverse the Court of International Trade ("CIT") and find that it had jurisdic-

tion under 28 U.S.C. § 1581(i) to address Hitachi's claims for refunds.  I respectfully dissent.

## I.  BACKGROUND

Hitachi commenced this action seeking to recover duties, plus interest, paid upon entries of plasma flat-panel televisions made in Mexico.  Hitachi timely filed claims at Customs for refund of excessive duties paid pursuant to 19 U.S.C. § 1520(d), alleging that the televisions were eligible for duty-free treatment under the NAFTA rules of origin.  Customs denied the claims and Hitachi filed protests with Customs under 19 U.S.C. § 1514.  Ten separate protests related to the televisions were filed by Hitachi between May 16, 2005 and March 6, 2007, but after more than two years, none of the protests were either allowed or denied by Customs.

The jurisdiction of the Court of International Trade ("CIT") is defined by 28 U.S.C. § 1581.  Section 1581(a) gives the CIT exclusive jurisdiction over "any civil action commenced to contest the denial of a protest . . . ."  Section 1581(i) provides residual jurisdiction to the CIT, including jurisdiction to hear claims relating to "administration and enforcement" of protests and refunds.  The central issues in this case are whether 19 U.S.C. § 1515(a) requires Customs to affirmatively act on all protests within two years, and whether all protests not expressly denied within that two year time period are allowed by operation of law.  Depending upon how § 1515 is interpreted, jurisdiction may or may not exist under § 1581(a) or § 1581(i).  If § 1515 causes undecided protests to be deemed denied after two years, jurisdiction exists under § 1581(a) to challenge the denial, but if § 1515 causes undecided protests to be allowed by operation of law, jurisdiction exists under § 1581(i) to compel a refund.  If

§ 1515 imposes no obligation on Customs to decide protests within two years, jurisdiction does not exist on either basis.

Section 1515 provides in relevant part as follows:

§1515.  REVIEW OF PROTESTS

(a)  Administrative review and modification of decisions

Unless a request for an accelerated disposition of a protest is filed in accordance with subsection (b) of this section ***the appropriate customs officer, within two years from the date a protest was filed*** . . . , ***shall review the protest and shall allow or deny such protest in whole or in part.***  Thereafter, any duties, charge, or exaction found to have been assessed or collected in excess shall be remitted or refunded . . . . Upon the request of the protesting party, . . . a protest may be subject to further review by another appropriate customs officer, under the circumstances and in the form and manner that may be prescribed by the Secretary in regulations, but ***subject to the two-year limitation prescribed in the first sentence of this subsection*** . . . . Notice of the denial of any protest shall be mailed in the form and manner prescribed by the Secretary. Such notice shall include a statement of the reasons for the denial, as well as a statement informing the protesting party of his right to file a civil action contesting the denial of a protest under section 1514 of this title.

(b)  Request for accelerated disposition of protest

A request for accelerated disposition of a protest filed in accordance with section 1514 of this title may be mailed by certified or registered mail to the appropriate customs officer any time concurrent with or following the filing of such protest. For purposes of section 1581 of title 28, *a protest which has not been allowed or denied in whole or in part within thirty days following the date of mailing by certified or registered mail of a request for accelerated disposition shall be deemed denied* on the thirtieth day following mailing of such request.

(emphases added).

The CIT dismissed Hitachi's complaint for lack of jurisdiction under either § 1581(a) or § 1581(i). *Hitachi Home Elecs., Inc. v. United States*, 704 F. Supp. 2d 1315 (Ct. Int'l Trade 2010) ("CIT Op."). In particular, the CIT found that § 1515(a) does not specify a consequence— either allowance or denial—for Customs' failure to decide a protest within two years, and that therefore the statutory deadline was not mandatory. *Id.* at 1319. According to the CIT, § 1515(a) does not deprive Customs of the power to act on a protest after the two year period. *Id.* The CIT also found that § 1515(b)'s accelerated disposition procedure was and is available to Hitachi to secure a "deemed denial" of its protest and thereby jurisdiction pursuant to § 1581(a). *Id.* at 1320. The CIT thus held it would be inappropriate to invoke jurisdiction under § 1581(i) without first following the protest and denial procedures provided in § 1515(b). *Id.* (citing *Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289 (Fed. Cir. 2008) ("While this court has described subsection

1581(i) as a broad residual jurisdictional provision, we have in the same breath said that the unambiguous precedents of this court make clear that its scope is strictly limited, and that the protest procedure cannot be easily circumvented.") (citations and internal quotation marks omitted)).

## II. DISCUSSION

This court reviews questions regarding the CIT's jurisdiction *de novo*. *Retamal v. U.S. Customs & Border Prot.*, 439 F.3d 1372, 1375 (Fed. Cir. 2006). The proper interpretation of § 1515(a) is an issue of first impression for this court. This pure legal issue of statutory interpretation is also reviewed *de novo*. *Cemex, S.A. v. United States*, 384 F.3d 1314, 1319 (Fed. Cir. 2004).

By its plain language § 1515(a) establishes a two-year time limit by which Customs "shall review the protest and shall allow or deny such protest in whole or in part." Not once but twice within § 1515(a) Congress indicated that Customs' review and decision obligations are "subject to the two-year limitation." It is clear that Congress imposed a meaningful two-year deadline upon Customs. The real question is what happens when Customs simply fails to do what the statute says it "shall" do within that period. While the CIT found that there is simply no consequence—that Customs is free to indefinitely delay making any decision on the merits of a protest—such a construction cannot be right because it renders § 1515(a) meaningless and frustrates Congress' intent for protest administration.

In this case, the use of the word "shall" in the statute is mandatory. Congress clearly indicated that § 1515(a) was intended to facilitate meaningful review of all protests—by Customs, not the courts—within the two year

time period.  Congress intended for Customs to lose the power to act after the expiration of the two year time period, and the plain meaning of the statutory language shows that if Customs failed to decide any protests within two years, those protests would be allowed by operation of law.

A.  The Two-Year Deadline of § 1515(a) is Mandatory

Use of the word "shall" in a statute can indicate a mandatory compulsion which, if not followed, negates action otherwise authorized by the statute.  *See, e.g., Escoe v. Zerbst*, 295 U.S. 490, 493 (1935) (statute requiring that probationers "shall forthwith be taken before the court" for a hearing was a mandatory prerequisite for revocation of sentence suspension); *French v. Edwards*, 80 U.S. 506, 511 (1872) (statute authorizing judicial sales of real property required that the sheriff "shall only sell the smallest quantity that any purchaser will take, and pay the judgment and all costs" was mandatory prerequisite for valid sale).[1]  This appeal presents such a statute.

---

[1]    The Supreme Court often finds that the word "shall" removes all discretion to satisfy the statutory obligations.  *See, e.g., Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661, 669 (2007) (statute providing that the EPA "shall approve" a transfer application under certain circumstances was "mandatory"); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (contrasting "may" and "shall" clauses within a statute, and finding that "Congress used 'shall' to impose discretionless obligations, including the obligation to provide drug treatment when funds are available"); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36-37 (1998) (statute providing that transferred actions "shall be remanded by the panel at or before the conclusion of such pretrial proceedings" places an "obligation" on

Of course, the presence of the word "shall," while a strong suggestion of mandatory meaning, is not always dispositive. *Escoe*, 295 U.S. at 493. The Supreme Court has found in certain cases that an agency's failure to do within a prescribed time period what a statute says it "shall" does not cause that agency to lose the power to act after the time period expires. *See*, *e.g.*, *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993) (statute required that customs agents "report immediately" all seizures and violations, which shall then be "report[ed] promptly" to the U.S. attorney who shall "forthwith" initiate appropriate proceedings); *United States v. Montalvo-Murillo*, 495 U.S. 711, 714 (1990) (statute required that a criminal bail hearing "shall be held immediately upon the person's first appearance before the judicial officer"); *Brock v. Pierce Cnty.*, 476 U.S. 253, 256 (1986) (statute provided that Secretary of Labor "shall investigate" and "shall" determine the truth of any allegation of misused funds within 120 days). The majority relies on these and other such cases for the proposition that the absence of an expressly recited consequence for inaction makes a prescribed time period directory, not mandatory.

None of the cases relied upon by the majority are applicable precedent for this appeal, however. First, those cases did not construe § 1515, a statute that carries its own distinct language and policy objectives, and which this court presently interprets as a matter of first impression. Second, all of those cases involved statutory time limits of a fundamentally different character than the two-year protest review period in § 1515(a). The longest time limit involved in any of the statutes in those cases

---

the panel to remand accordingly, "and no exercise in rulemaking can read that obligation out of the statute").

was 120 days. *See*, *e.g.*, *James Daniel Good Real Prop.*, 510 U.S. at 63 ("immediately," "promptly," "forthwith"); *Montalvo-Murillo*, 495 U.S. at 714 ("immediately"); *Brock*, 476 U.S. at 256 ("120 days"). The short time limits in the respective statutes were plainly intended to "spur" the agency to take prompt action in various contexts. *See Brock*, 476 U.S. at 265; *see also Gilda Indus. v. United States*, 622 F.3d 1358, 1363-65 (Fed. Cir. 2010). Strict adherence to the statutory time periods would have frustrated a larger policy objective by taking away the agency's power to act under the same statute that plainly encourages the agency to take action. *See*, *e.g.*, *James Daniel Good Real Prop.,* 510 U.S. at 65 ("It would make little sense to interpret directives designed to ensure the expeditious collection of revenues in a way that renders the Government unable, in certain circumstances, to obtain its revenues at all."); *Montalvo-Murillo*, 495 U.S. at 720 ("[T]here is no reason to bestow upon the defendant a windfall and to visit upon the Government and the citizens a severe penalty by mandating release of possibly dangerous defendants every time some deviation from the strictures of § 3142(f) occurs."); *Brock*, 476 U.S. at 265 ("It would be very odd if Congress had implemented that intent by cutting off the Secretary's authority to correct abuses just 120 days after learning of them.").

Section 1515(a), by contrast, involves a time period of two whole years for Customs to complete its substantive review of protests. This period is immensely longer than those in the cases relied upon by the majority, and is more like a statute of limitations than a provision to spur Customs to quick action.[2] As explained below, at the time

---

[2] The majority correctly points out that the cases "do not establish that long time limits are mandatory and short time limits are directory." Maj. Op. at 9 n. 1. The

of § 1515's enactment 90 days was believed to be sufficient for nearly all protests to be fully reviewed and decided. The two-year period was intended to facilitate meaningful administrative review of protests by ensuring that action, prompt or otherwise, is absolutely taken by Customs within two years. Given this legislative purpose for § 1515(a), the word "shall" must be read as mandatory, and to remove Customs' power to act after two years. To the extent this result may be characterized as a "coercive sanction," *James Daniel Good Real Prop.,* 510 U.S. at 63, such was Congress' intended design for Customs' protest review procedures.

### 1. Congress Intended for Customs to Lose the Power to Act on Protests After Two Years

The background and legislative history of § 1515 demonstrates the strict and mandatory nature of the two-year time period for protest review and disposition.

### a. Pre-1970 Protest Legislation and Customs Practice

Prior to 1970, § 1515 provided that Customs had ninety days to review protests. *See* 19 U.S.C. § 1515 (1965); Tariff Act of 1930, Pub. L. No. 71-361, § 515, 46 Stat. 590, 734. Any denied protests were automatically transferred to the United States Customs Court for

---

shorter time periods in those cases are not so much a "coincidence" as a result of the common policy objective that underlie the statutes—spurring the agencies to take quick action. *Id.* It is the different policy objective behind § 1515(a) that primarily distinguishes this appeal from those cases, but the drastically different time periods alone are nevertheless indicative of the divergent purposes of the statutes.

review.  *Id.*  Protests that were undecided after 90 days were treated as denied, Customs lost jurisdiction over those protests, and those protests were likewise automatically transferred to the Customs Court for review.  *H. K. Wheeler, Inc. v. United States*, 9 Cust. Ct. 30, 33-34 (1942).  Data provided by Customs to Congress around 1970 showed that "all protests were processed in an average period of 58 days from the date of receipt, and more than 97 percent were fully processed within 90 days of the date of their receipt."  S. REP. NO. 91-576, at 28 (1969).  A small but significant portion of protests were undecided after the statutory 90 day limit.

The automatic transfer process resulted in "thousands" of cases being filed at the Customs Court resulting in the creation of "plaintiffs" that often never intended to initiate or prosecute such actions.  S. REP. NO. 91-576, at 29.  Congress identified the automatic referral practice as one of the "major defects" in the pre-1970 protest law.  *Id.* at 10.  The administrative burden caused by this practice was substantial and unnecessary.  *See id.* ("[E]limination [of automatically referred] cases will be a great service to the Customs Bureau and the Customs Court . . . .").  As shown below, the CIT's and majority's decision operates to encourage *de facto* transfers of undecided protests to the CIT for review, a practice which was rejected and remedied by Congress.

### b.  The Customs Courts Act of 1970

As originally proposed, § 1515(a) imposed no time limit on Customs' review of protests and permitted but did not obligate Customs to dispose of protests: "The appropriate customs officer shall review a protest filed in accordance with section 514 of this Act and *may* allow or deny such protest in whole or in part."  S. 2624, 91st

Cong. § 208 (1969) (emphasis added). The Senate Bill also included § 1515(c) which provided for a "constructive denial" of all protests that were undecided after two years. *Id.* ("Any protest which has not been allowed or denied in whole or in part in accordance with paragraph (a) of this section . . . shall be deemed denied after two years have elapsed from the date the protest was filed . . . ."). Thus, as under the pre-1970 law, in the original bill there was no requirement that Customs decide protests, and any undecided protests after a certain time period were deemed denied. While Congress may have initially contemplated a non-mandatory and temporally unbounded protest adjudication process, the bill was quickly amended to reject such a statutory scheme.

The Senate Committee on the Judiciary amended the language of § 1515(a) to impose a two-year time limit, and changed "may allow or deny" to "shall allow or deny":

> [T]he appropriate customs officer, within two years from the date a protest was filed in accordance with section 514 of this Act, *shall* review the protest and *shall* allow or deny such protest in whole or in part.

S. REP. NO. 91-576, at 2-3 (emphases added). The Committee also deleted subsection (c)'s "constructive denial" provisions. *Id.* at 3. The Senate Committee Report explained that these revisions were intended to impose "an *obligation* on the Bureau of Customs to act on the merits of all protests within 2 years." *Id.* at 30 (emphasis added). Customs was to be given a two-year time period in which to review and dispose of protests, and not a day more. *Id.* at 11 ("An *overall limit* of two years will be set in which the Bureau of Customs *must* dispose of a protest on its merits"); *id.* at 28 ("New section 515(a) provides a

*maximum* period of 2 years from the date of filing of a protest for administrative review.") (emphases added); *see also* H. REP. NO. 91-1067, at 28 (1970) (discussing "maximum period of 2 years" which "afford[s] a maximum opportunity for meaningful administrative review").

The two-year time period was believed to be more than adequate for Customs to fully review and dispose of all protests on the merits. Based on Customs' representations that nearly all protests were reviewed and decided within 90 days, the Senate Committee expressly stated that although the new § 1515(a) substantially extends the time period for review to two years,

> [i]t is not contemplated, however, that any significant number of protests will require the entire 2-year period for review. The Treasury Department has assured your Committee that it expects to continue its processing of protests in substantially the same time period that have been required under existing law.

S. REP. NO. 91-576, at 28; H. REP. NO. 91-1067, at 28. The plain and stated purpose of giving Customs a two-year review period—eight times longer than was typically needed—was to achieve "meaningful" review and disposition of protests by Customs rather than continue the process of sending undecided or "deemed denied" cases to the courts for judicial review. S. REP. NO. 91-576, at 27 ("This [existing 90-day] time limit is substantially increased [to two years] to afford a maximum opportunity for meaningful administrative review."); H. REP. NO. 91-1067, at 28 (stating same). These kinds of clear statements from committee reports are "highly persuasive" evidence of Congressional intent. *Bingham & Taylor Div., Va. Indus. v. United States*, 815 F.2d 1482, 1485

(Fed. Cir. 1987). While there is ample evidence that Congress intended for Customs to complete its review of protests in no more than two years, there is nothing in the legislative history suggesting that Congress intended for review of protests to potentially go on forever.

* * *

Strict enforcement of the two-year deadline of § 1515(a) facilitates, not frustrates, Congress' intended design for protest procedures. Congress recognized that the public interest would be best served by having Customs perform a meaningful review of protests and to dispose of all protests on their merits, all within a time period perceived to be reasonable and feasible. The 90-day period under the pre-1970 law was insufficiently short, and led to the courts being overburdened by masses of automatic appeals being filed. Thus, the time limit was substantially enlarged beyond what was perceived as necessary, the intention being that in no event would Customs need or be permitted to exceed that limit.

### B.  § 1515(a) Provides that Absent Action Within Two Years, Protests are Allowed by Operation of Law

Having established that it is mandatory for Customs to meaningfully review all protests within the two-year time frame of § 1515(a), I turn now to the issue of the consequence for non-compliance. While the majority finds there is no consequence in the statute, I find that the consequence is clearly stated therein. The action mandated by the statute is that Customs review protests within two years, and the plain language of § 1515(a) specifies that one of two consequences must occur by the two-year deadline as a result of that action: the protest is

either "allow[ed]" or "den[ied]," and any denial must be made express with a mailed notice stating the reasons for the denial. § 1515(a). The statute does not provide for any other alternative outcomes. It is undisputed that there has been no denial of Hitachi's protests in this case. Under the plain language of § 1515(a), there is a consequence for Customs' inaction—Hitachi's protests have been allowed and the protested duties must be refunded.[3]

Congress' use of the word "allow" further indicates that § 1515(a) provides for protests to be deemed decided in a protestant's favor in the event that Customs fails to deny the protest. Each word in a statute is to be interpreted according to its ordinary, contemporary, and common meaning. *Williams v. Taylor*, 529 U.S. 420, 431 (2000); *see also Strategic Hous. Fin. Corp. v. United States*, 608 F.3d 1317, 1323 (Fed. Cir. 2010) ("The best evidence of congressional intent is the plain meaning of the statutory language at the time Congress enacted the statute."). When Congress enacted § 1515, "allow" meant to permit by inaction. *See* RANDOM HOUSE DICTIONARY OF

---

[3] The majority suggests that this conclusion is "predicated on an unstated and false premise that Congress had only two choices—automatic denial and automatic allowance—and that if Congress rejected one, it necessarily adopted the other." Maj. Op. at 14-15 n. 2. This dissent neither makes nor implies any such argument. Regardless of how many choices were available to Congress, the language of § 1515(a) is clear on its face, stating that all protests are allowed if not expressly denied within two years. That much cannot be more clearly stated. The issue on appeal is whether § 1515(a) as a whole is mandatory or merely aspirational. The majority finds it to be aspirational, resulting in indefinite indecision—an outcome unacceptable to Congress according to the legislative history.

THE ENGLISH LANGUAGE (1967) (defining "allow" as "to permit by neglect, oversight, or the like." "Allow implies complete absence of attempt, or even an intent, to hinder."); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1969) ("Allow implies refraining from any hindrance, whereas permit suggests authoritative consent. Inherent in both is the authority to act."); WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1967) ("allow" means "to neglect to restrain or prevent").[4] The

_____

[4] Other Customs regulations also use the word "allow" in the context of a passive permission of activity. *See* 19 C.F.R. § 19.30 (provision entitled "Domestic wheat not to be allowed in bonded space" commands that "[t]he presence . . . shall not be permitted"); 19 C.F.R. § 212.06 (provision entitled "Allowable fees and expenses" sets forth pre-authorized scope of fees and expenses that may be awarded to a prevailing party before the ITC). By contrast, the active word "approve" is used in the regulations to indicate affirmative authorization on the part of Customs. *See, e.g.*, 19 C.F.R. § 112.13 ("The port director shall approve an application for authorization as carriers of bonded merchandise and the bond filed, authorizing the applicant to act as a carrier of bonded merchandise . . . ."); 19 C.F.R. § 114.12 ("The Commissioner may suspend or revoke the approval previously given to any issuing association . . . ."). This shows a clear understanding, at least within Customs, of the difference between passive allowance and active approval.

Furthermore, this court's precedent is replete with opinions consistently using the word "allow" in accordance with its ordinary meaning of permitting by inaction. *See, e.g.*, *Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1362 n. 25 (Fed. Cir. 2006) ("Customs nonetheless ignores this order and allows liquidation to occur at an incorrect rate."); *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1287 (Fed. Cir. 2004) ("This would allow petitioners to skew the results . . . ."); *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1380 (Fed. Cir. 2001) ("[I]t strikes us as an illogical result to allow the

fact that § 1515(a) requires the refund of money "*found* to have been assessed or collected in excess" does not detract from the passive nature of the allowance itself, but only indicates that an allowance—express or implied by law— is tantamount to a finding of entitlement that triggers Customs' refund obligations.[5]

The legislative history of § 1515(a) also demonstrates that Congress intended protests to be allowed without any action by Customs such as the action it required for denied protests. Congress heard testimony arguing that an allowance should be reflected by a notification because

---

patent holder . . . to sue an alleged infringer for activities that occurred before the issuance of the certificate of correction."). At least one other court has had occasion to expressly define "allow" and concluded that the word has a clearly passive meaning. *Erickson v. Wis. Dep't of Corr.*, No. 04-C-265-C, 2004 U.S. Dist. LEXIS 20770, at \*15 (W.D. Wis. Sept. 29, 2004) ("The word [allow] implies passivity, as when a person lets something occur without acting to make it occur. By using the word 'allow,' plaintiff's amended complaint can fairly be read to suggest that the individual defendants took no affirmative steps that placed plaintiff in danger.") (citations omitted).

[5]    Customs argues that "[i]t is difficult to envision that Congress would have intended such a negative impact on revenue (i.e., providing for the deemed allowance of a protest after two-years) without clearly setting forth such a consequence in the statute." Customs' Br. at 23. However, as explained herein, Congress' use of the word "allow" specifies the consequence for such inaction. Further, the state of affairs of Customs at the time of § 1515's enactment was such that nearly all protests were decided within 90 days, and so there was no perceived "negative impact on revenue" when Congress provided for allowance to occur by operation of law after two years. *See supra.* Customs' arguments made today to the contrary are best directed to Congress and not this court.

such notification would immediately enable importers to "then file subsequent entries at the correct value or rate." *Hearings Before Subcommittee No. 3 of the Committee on the Judiciary, House of Representatives*, 91st Cong. 144-45 (1970) (statement of Gerald H. O'Brien, executive vice president, American Importers Association). Indeed, this is the only value of a notice for an allowed protest. A notice of denial serves the same informative purpose but more importantly forms the basis for appeal, whereas nobody appeals an allowed protest. Congress ultimately declined to amend the bill and provide for any allowance notification. The Committee Reports explained that "no useful purpose would be served by imposing on customs the burden of mailing separate notices of allowance" since "protest allowances are reflected in the notices of reliquidation and in refund payments." S. REP. NO. 91-576, at 30; H. REP. NO. 91-1067, at 29-30 (1970). Congress' decision not to mandate allowance notices further reflects its intent that refunds be issued without any further hindrances, i.e., that protested duties be passively "allowed" to be refunded.

### 1.   The Accelerated Disposition Procedure

The CIT and the majority concluded that § 1515(b), the "accelerated disposition" provision, shows that § 1515(a) includes no consequence for Customs' inaction. Section 1515(b) allows a protestant to file a request for accelerated disposition, and any "protest which has not been allowed or denied in whole or in part within thirty days [of the request] . . . shall be deemed denied." Although section 1515(a) does not include similar "shall be deemed allowed" language, it nevertheless specifies a consequence for inaction as explained above. Consequential language can take many forms, and need not mimic the style of § 1515(b).

In any event, the relevance of § 1515(b) to the interpretation of § 1515(a) is questionable since section 1515(b) serves a fundamentally different purpose than § 1515(a). Congress characterized § 1515(b) as a reasonable assurances provision, noting that "[i]mporters concerned about unreasonable delay at the administrative level are fully protected by the new provision in section 515(b) for obtaining accelerated disposition of a protest." S. REP. NO. 91-576, at 28. Unlike § 1515(a), § 1515(b) does not impose upon Customs any obligation to affirmatively act on a protest. Hence § 1515(b) is no substitute for actual meaningful administrative review, and its primary purpose is to provide an expedited avenue for judicial review of the denial. S. REP. NO. 91-576, at 29 ("If no final action is taken by the Bureau of Customs within 30 days . . . the protesting party will be free to file a summons in the Customs Court with respect to the protested issues."); H. REP. NO. 91-1067, at 29 (stating same).

Furthermore, I disagree with the CIT's and majority's determination that § 1515(b) exists as an escape valve for Customs' inaction under § 1515(a). Whereas Hitachi seeks meaningful review and disposition by Customs pursuant to § 1515(a), the CIT and the majority simply direct Hitachi to § 1515(b) to secure jurisdiction to challenge a deemed denial in court. However, this kind of *de facto* transfer to the courts should not be encouraged, as it is one of the precisely identified "major defects" in the pre-1970 law that Congress sought to remedy when it enacted § 1515. S. REP. NO. 91-576, at 10.

Regardless of the propriety of encouraging parties generally to seek a deemed denial, for Hitachi the accelerated disposition procedure is no longer available. The statutory text makes clear that no protests may be undecided after two years. The legislative history confirms

that the two-year period was absolute even for the most complicated kinds of protests:

> [Sometimes further review] may resolve an issue that would otherwise require litigation, *e.g.,* where [the importer] indicates that the treatment of the protested entry is not uniform and consistent with the treatment of the same merchandise elsewhere in the Untied States, or where [the importer] can show that a novel issue is raised with respect to which the Bureau does not have a fixed position and which is not already under higher level review. Such further review is also expected to consume more time than the average period required to review a protest under existing law. *The two-year provision will, of course, apply to protests under such review.*

S. REP. NO. 91-576, at 28-29 (emphasis added); H. REP. NO. 91-1067, at 29 (stating same).

Hitachi's protests are of the type Congress contemplated as complex and requiring careful analysis, and which might require the "entire 2-year period for review." *See* S. REP. NO. 91-576, at 28. According to Customs, however, "[g]iven the number of entries, the complexity of the substantive issues, and the fact that another importer [Samsung International, Inc.] filed protests presenting similar issues, Customs was unable to take action on Hitachi's lead protest and application for further review within the two-year time period of § 1515(a) . . . ." Customs' Br. at 6. Granted, Hitachi's and Samsung's many protests all involved multiple entries of essentially the same kinds of flat-panel plasma televisions from various producers in Mexico, and required a careful and thorough analysis of the operation of the NAFTA rules of origin, but

this is no excuse for Customs' inaction in the face of a statute that imposes a mandatory two-year deadline. Like Hitachi's protests in this case, Samsung's protests were also pending for more than two years, and Samsung challenged Customs' inaction in the CIT. Samsung later voluntarily dismissed its pending CIT actions without prejudice and filed a request for accelerated disposition, obtained a deemed denial, and refiled at the CIT having supposedly secured jurisdiction under 28 U.S.C. § 1581(a). Under the proper reading of § 1515(a), however, Samsung could not have received accelerated disposition (and a deemed denial) when it did because the protests would have been, by operation of law, already allowed. By contrast, Hitachi correctly insists that review and disposition of its protests under § 1515(a) has concluded, and properly recognizes that it can no longer avail itself of the accelerated disposition procedure.

Since only about three percent of protests took longer than 90 days to be decided by Customs in 1970, as originally enacted accelerated disposition under § 1515(b) was not even available until 90 days after the protest was filed. S. REP. NO. 91-576, at 29. In the unlikely event that protests took longer than 90 days to be reviewed and decided, a protestant eager for judicial review could "accelerate" the disposition process to obtain a final denial *sooner* than two years, but in no event could the protestant obtain any relief after the two-year deadline expired. The majority emphasizes that § 1515(b) allows for such accelerated disposition requests to be initiated at "*any time* concurrent with or following the filing of such protest," and argues that this language shows that the procedure is available even after two years. Given the history of § 1515(b) and the two-year limitation of § 1515(a), however, this language is better understood as indicating that protestants need no longer wait for 90

days after the protest was filed to request accelerated disposition. Because more than two years' time has elapsed, the accelerated disposition procedure is no longer available to Hitachi to secure jurisdiction under § 1581(a).

### III. CONCLUSION

Hitachi's protests have been allowed by operation of law, and the CIT has jurisdiction under § 1581(i). Allowing customs to indefinitely delay deciding protests forces importers to either: (a) wait until Customs eventually makes a decision on the merits of the protest, resulting in unreasonably extended periods of financial and legal uncertainty for the importer and the trade community; or (b) file a request for accelerated disposition to merely secure jurisdiction for judicial review, and proceed to court on a record not fully developed before Customs. Such a dilemma was intended to be avoided by § 1515, and in particular by automatically allowing protests that were still undecided upon the two-year deadline.

The plain meaning of the statute and the legislative history do not support the CIT's and the majority's decisions encouraging protestants to abandon hope for relief from Customs under § 1515(a), and instead to seek a deemed denial under § 1515(b) to get to court. As this is a case of first impression, the majority opinion in essence rewrites the statute by changing the word "shall" to "may" and eliminating any reference to a two-year deadline. This is a course I cannot follow. Congress intended for Customs to meaningfully review and decide all protests within two years so that the courts would not be needlessly burdened, so that the trading community could benefit from Customs' well-reasoned rulings in complex cases. Ultimately, if Customs for whatever reason is unable to comply with the two-year time limit under § 1515(a), then Congress, not this court, is the proper

forum for Customs to appeal. Congress provided for a two-year maximum review period, and this court cannot rewrite the statute because Customs' circumstances may have changed since 1970.